In the

# United States Court of Appeals

## For the Seventh Circuit

No. 19-1244

KAREN VAUGHN,

*Plaintiff-Appellee,*

*v.*

JENNIFER WALTHALL, in her official
capacity as Secretary of the
Indiana Family and Social Services
Administration, *et al.,*

*Defendants-Appellants.*

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 16 C 3257 — **Jane Magnus-Stinson**, *Chief Judge.*

ARGUED MAY 22, 2020 — DECIDED AUGUST 5, 2020

Before BAUER, EASTERBROOK, and WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.* Federal law prohibits discrimination
against persons with disabilities, and in furtherance of that
goal, it requires states to administer public programs "in the
most integrated setting appropriate to the needs of qualified
individuals with disabilities." That duty is bounded by the

standard of reasonableness; states are not obligated funda-
mentally to alter their programs to comply.

At issue here is whether the anti-discrimination mandate
compels a state to structure and fund its Medicaid programs
in a manner that ensures that all Medicaid recipients who de-
sire to receive health care in a home setting may do so regard-
less of cost to the state. In addition, we must decide how, if at
all, the state's adoption after oral argument of a pilot program
that provides greater flexibility to those who want home
health care affects this case. We conclude that we still face a
live controversy but that further proceedings are necessary.
We also conclude that the permanent injunction issued by the
district court swept too broadly. If any injunction is still war-
ranted—a question on which we take no position—it must be
narrowly tailored to any violations that are proven.

**I**

Karen Vaughn has lived with quadriplegia for approxi-
mately 40 years and has received home-based care for over 30
years. She relies on others to help her with all basic daily tasks
and her medical care. She strongly prefers to live at home ra-
ther than in a nursing facility or other institution. In 2012 she
had a tracheostomy, which is still in place; she uses a ventila-
tor at night to help her breathe. She must have help with per-
sonal care (hygiene, dressing, eating, etc.), household mainte-
nance, mobility exercises, transportation, medications, suc-
tioning secretions from her tracheostomy, and use of the ven-
tilator. This amounts to 20+ hours per day of in-home nursing
care. On occasions when nursing shifts cannot be staffed,
Vaughn has relied on friends to fill the gaps.

Until January 2016, the Indiana Family and Social Services Administration (FSSA) approved and coordinated Vaughn's plan of care, and a state-approved home-health agency managed it day-to-day. The state funded her care through two Medicaid programs for which it receives federal reimbursement: the core Medicaid program ("prior-authorization services"), which covered up to 16 hours per day of at-home nursing services for Vaughn; and the "Aged and Disabled" waiver program ("A&D waiver"), which covered additional hours of non-medical attendant-care services, including assistance with personal hygiene, meal preparation, and household tasks. The A&D waiver program is intended to facilitate care in both home- and community-based settings for those who otherwise would need to be institutionalized. Under regulations in effect at the time, Vaughn had the option to select her own caregivers and arrange for them to receive A&D waiver funds. In contrast, she could not personally direct nursing care funded through the core Medicaid program. Both nursing staff and attendant-care providers were paid at the state's federally approved Medicaid rates for the particular services they performed.

In January 2016, Vaughn was hospitalized with pneumonia. That's when the trouble began. She was cleared by her doctors to be discharged within a week, but the state could not find any nurses available to provide the round-the-clock care she needs when she is at home. Matters had changed dramatically while she was in the hospital: the home-health agency that had been managing her care could not resume its services, because it had reassigned its nurses to other clients. It did so, it said, because it could no longer afford to provide Vaughn's care at the low Medicaid reimbursement rates. Over the next few months, FSSA staff members contacted over 50

other home-health agencies, but none would accept Vaughn as a client. As a result, she remained in the hospital against her will.

In April 2016, Vaughn sent a letter to the FSSA requesting renewed authorization for a plan of care that included 22 hours per day of nursing services and two hours per day of attendant care. Given the difficulty the state had experienced in finding a home-health agency to manage staffing for her, Vaughn sought permission to self-direct all her care, not just the attendant portion. She proposed that she would directly hire a case manager, nurses, and other providers, and that the state would bankroll everything using funds from the Medicaid prior-authorization program, the Medicaid waiver program, or other public health care programs. The only problem was that this arrangement was not authorized under Indiana's existing regulations. Vaughn also asked to hire "qualified staff for the level of service I believe most appropriate to my needs." In other words, she wanted the ability to hire and train people who would be paid by the state but who lack the credentials the state considers necessary to furnish her medical care. Vaughn's doctor and social worker at the hospital supported her request. They believe that home-based care delivered by non-nurses who have been trained to perform skilled tasks such as those involving her tracheostomy and ventilator will meet her needs. In the hospital, various medical specialists performed these tasks; in Vaughn's home, nurses handled them before her hospitalization.

The FSSA denied Vaughn's request and instead continued to search in vain for a home-health agency that would accept her as a client. In November 2016 Vaughn was transferred to a nursing home. She filed a complaint in the district court on

November 30, 2016, bringing claims under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132; section 504 of the Rehabilitation Act, 29 U.S.C. § 794; and the reasonable-promptness provision of the Medicaid Act, 42 U.S.C. § 1396a(a)(8). Meanwhile, time dragged on through 2017 and the first half of 2018 with no progress. The FSSA continued to insist that Vaughn's nursing care be coordinated through a home-health agency rather than through self-direction, but it was unable to find an agency or combination of agencies willing to provide her care at Medicaid rates.

Both parties moved for summary judgment. On June 1, 2018, the district court granted summary judgment in favor of Vaughn. It followed up on January 9, 2019, with a permanent injunction requiring the state to "do whatever is necessary to achieve the result" that Vaughn wanted: round-the-clock home-based care, fully paid for by the state. On February 8, 2019, in response to a court order requiring it to certify its compliance with the injunction, the state notified the court that Vaughn had returned home and that it had allocated state funds in the amount needed to cover her home-health and attendant-care services. It did so through a unique contract with Tendercare, a home-health agency, which agreed to provide Vaughn's skilled nursing care at a market rate of $65 per hour. (This is roughly half again as much as the Medicaid rate of $43.34.) The state is not authorized to use any federal Medicaid funds to pay Tendercare, because the contract exceeds the Medicaid cap.

Indiana now appeals both the summary judgment in Vaughn's favor and the permanent injunction.

## II

We examine the district court's decision to grant summary judgment *de novo*, taking the record in the light most favorable to the party against whom summary judgment was granted and drawing all reasonable inferences from the evidence in that party's favor. *Skyrise Constr. Grp., LLC v. Annex Constr., LLC*, 956 F.3d 950, 955 (7th Cir. 2020). We "consider only what was before the judge at the summary judgment stage." *Indiana Funeral Dirs. Ins. Trust v. Benefit Actuaries, Inc.*, 533 F.3d 513, 518 (7th Cir. 2008). "Summary judgment is appropriate when there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law." *Skyrise Constr.*, 956 F.3d at 955–56.

### A.    ADA and Rehabilitation Act

*1. Standard for Liability*

The ADA and the Rehabilitation Act prohibit discrimination against qualified persons with disabilities. 42 U.S.C. § 12132; 29 U.S.C. § 794(a). For present purposes, there is no material difference between these two laws, *Radaszewski ex rel. Radaszewski v. Maram*, 383 F.3d 599, 607 (7th Cir. 2004), and so in this opinion we generally refer only to the ADA. The law "explicitly identifie[s] unjustified segregation of persons with disabilities as a form of discrimination." *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 600 (1999) (internal quotation marks omitted). Under regulations promulgated by the Attorney General, when a state chooses to provide services, programs, or activities for its residents, it must administer the "services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."

28 C.F.R. § 35.130(d); see also *id.* § 41.51(d). A state "might violate the integration mandate if … through its planning, service system design, funding choices, or service implementation practices, [it] promotes or relies upon the segregation of individuals with disabilities in private facilities or programs." *Steimel v. Wernert*, 823 F.3d 902, 911 (7th Cir. 2016) (internal quotation marks omitted).

But the integration obligation is not unbounded. In order to comply with federal law, a state must "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, *unless* the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7)(i) (emphasis added). States are entitled to resist the latter type of changes. *Olmstead*, 527 U.S. at 603.

States therefore must provide community-based treatment for persons with disabilities when: 1) the state's treatment professionals determine that such placement is appropriate; 2) the affected persons do not oppose such treatment; and 3) the placement can reasonably be accommodated, taking into account the resources available to the state and the needs of others with disabilities. *Olmstead*, 527 U.S. at 607; see also *Steimel*, 823 F.3d at 914. In *Steimel*, we acknowledged that the third element "represent[ed] the thinking of only a plurality of the Court," while the first two commanded a majority. 823 F.3d at 914–15. Nonetheless, the concurring opinions made "clear that some version of the 'reasonable modifications' provision—and its flip side, the fundamental-alteration defense—must be taken into account before deciding that the

integration mandate was violated." *Id.* at 915. Thus, "the question under the ADA is a simple one: what effect will changing the state's practices have on the provision of care to the … disabled, taking into account the resources available to the state and the need to avoid discrimination?" *Id.*

*2. Summary Judgment Record*

Despite substantial effort, the FSSA has not been able to arrange the care Vaughn wants within the constraints of its Medicaid prior-authorization and waiver programs. Under Indiana's Medicaid program guidelines, Vaughn is eligible for up to 16 hours per day of reimbursable skilled nursing or home-health-aide services arranged through a home-health agency. On a case-by-case basis the state may deviate from the guidelines in order to meet a valid medical need. In the past, it has approved Vaughn for 20+ hours of skilled nursing per day. "Skilled providers" include registered nurses, licensed practical nurses, and home-health aides, among others. Relevant to our case, the guidelines classify as "services requiring skilled care" several things that Vaughn needs, including the administration of oral medication, urostomy maintenance, ventilator operation, and tracheostomy suctioning. But the guidelines do not specify who is authorized to perform "services requiring skilled care" or whether those services are reimbursable with Medicaid funds only when performed by persons with particular credentials.

Vaughn is authorized under the A&D waiver program to receive several hours per day of reimbursable attendant-care services, such as assistance with personal care, emptying urine collection and colostomy bags, mobility, nutrition, and household tasks. These services are not a substitute for skilled

medical care provided by doctors, nurses, or other professionals. The A&D waiver program permits coordination of services by a licensed home-health or personal-services agency, or by "self-direction," which is the term used when the client hires her providers directly and those providers are reimbursed by the state. Whether services are acquired through an agency or through the client's self-direction, all attendant-care providers must meet certain state licensure and qualification requirements and be approved by the FSSA. See Ind. Code § 16-27-4-6; 455 Ind. Admin. Code §§ 2-6-1, 2-6-2, 2-6-3, 2-11-1.

No matter what the service, Medicaid will reimburse only if "standards of any State licensure or certification requirements are met for services or for individuals furnishing services that are provided." 42 C.F.R. § 441.302(a)(2); see also 405 Ind. Admin. Code § 5-29-1(2) ("Services provided outside the scope of a provider's license, registration, certification, or other authority to practice under state or federal law" are not covered by Medicaid.).

After Vaughn was stranded in the nursing home despite her desire to live at home, she requested several specific accommodations:

   1)   A baseline of 22 hours per day of prior-authorization services, plus two hours per day of homemaker, attendant care, and other necessary services through the A&D waiver.

   2)   The right directly to hire and train qualified staff for the level of service she believes most appropriate to her needs at competitive, non-Medicaid-capped

rates, to cover the hours of service approved in her Medicaid care plan.

3)      Payroll and related services furnished by the state (either directly or by contract) to cover the staff she hires.

4)      Waiver of the normal requirements to hire either licensed nursing staff or staff employed by a Medicaid provider agency.

5)      Coverage in her authorized care plan of the cost of hiring a qualified, professional long-term care case manager of her choosing, at a competitive private rate.

Vaughn's doctor and social worker supported these requests and recommended that she return home rather than remain institutionalized. The state rejected without explanation all but the first request, and FSSA staff members continued the fruitless search for a home-health agency that would provide Vaughn's care at Indiana's federally approved Medicaid rates. Vaughn argued that the state's denial of her proposed accommodations violated the ADA and the Rehabilitation Act.

The state insisted that it did not deny Vaughn access to any programs. Her FSSA-approved amount of care stayed the same after her hospitalization in 2016 as before. She remained in institutions—first the hospital and later the nursing home—only because there were no qualified providers willing to work at Medicaid rates. Further, the state contended, Vaughn's request to self-direct her care in its entirety would constitute a fundamental alteration to existing programs, be-

cause self-direction was at the time permitted only for at-
tendant-care services provided under the A&D waiver pro-
gram. Skilled nursing care provided as a prior-authorization
service was not. If she were allowed to self-direct her nursing
care, it argued, that would create a new service program not
offered to any other Medicaid recipient in Indiana, and "a
State is not obligated to create new services" in order to com-
ply with the ADA. *Steimel*, 823 F.3d at 913 (quoting
*Radaszewski*, 383 F.3d at 609).

The state also protested that allowing Vaughn's request to
direct her own hiring and care and to waive the requirement
that certain tasks be performed by licensed nurses would be
an unreasonable accommodation. It pointed out that federal
"Medicaid regulations permit a state to establish reasonable
standards relating to the qualifications of providers" and "In-
diana Medicaid has determined that many of Vaughn's re-
quired services are skilled services requiring a medical prac-
titioner, including management of her tracheostomy, suction-
ing, management of her ventilator, and administration of her
medications." Allowing unlicensed personnel to provide
Vaughn's medical care *and receive reimbursement*, it said,
would fundamentally alter Indiana's Medicaid home-health
programs. (Regulations allow family members or other care-
givers to provide required care, but they cannot be paid by
the state. Vaughn's ex-sister-in-law sometimes provided care
to Vaughn when nursing staff were unavailable.)

Finally, the state argued that Vaughn's request to pay her
providers at competitive market rates rather than the lower
approved Medicaid rates was a disguised challenge to Indi-
ana's Medicaid reimbursement rates. Vaughn did not seri-
ously challenge this point. In the district court, she criticized

the low Medicaid reimbursement rates for nursing care and attendant care and asserted that she would be able to arrange care if the state would pay higher rates. The state countered with a citation to *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320 (2015). There the Supreme Court held that a health-care provider has no private claim against a state on the theory that the state's Medicaid reimbursement rates are too low to ensure an adequate number of providers and level of care. "The sheer complexity associated with enforcing § 30(A), coupled with the express provision of an administrative remedy, § 1396c, shows that the Medicaid Act precludes private enforcement of § 30(A) in the courts." 575 U.S. at 329. We followed suit in *O.B. v. Norwood*, 838 F.3d 837 (7th Cir. 2016), where (citing *Armstrong*) we declined to "order the agency to eliminate the shortage [of nurses willing to work at Medicaid reimbursement rates] by raising those rates." *Id.* at 842.

The district court concluded that Vaughn's proposed modifications were minor and reasonable and that the state failed to carry its burden to prove a fundamental alteration. It saw the state's refusal to provide Vaughn's requested accommodations as based on discretionary policy choices about who could provide certain services and out of what pots of money those services would be reimbursed, not on legal constraints. The court also thought that it "need not delve into" the propriety of Vaughn's challenge to the Medicaid reimbursement rates "because reimbursement rates, adequate or not, are not determinative as to Ms. Vaughn's claim."

*3. Reasonableness of Proposed Accommodations*

We begin with the question whether Vaughn's request to self-direct her care in its entirety is a reasonable accommodation or instead requires a fundamental alteration to Indiana's existing Medicaid programs.

When this case was before the district court, Indiana offered all eligible Medicaid recipients prior-approval home-care services coordinated through a home-health agency (*i.e.* not self-directed). It also offered attendant-care services, which could be self-directed, under the A&D waiver program. Vaughn asked the state to modify either the prior-approval program to allow self-direction, or the A&D waiver program to allow self-direction of all services, not just attendant care. At the time, either request would have provided Vaughn with a benefit that no other Indiana Medicaid recipient received.

Shortly after oral argument, the landscape changed. Effective May 26, 2020, Medicaid allowed Indiana to introduce a pilot program for self-directed skilled medical care, available to Medicaid recipients in two zip codes in the Indianapolis area. (We refer to this as the Pilot.) We requested supplemental briefs from the parties about the effect of these changes. Everyone agrees that Vaughn (who lives in one of the designated zip codes) is eligible for this program. It is possible that the Pilot would give her everything she wants as an accommodation. Aged & Disabled Waiver Program Amendment, https://www.in.gov/fssa/files/Aged%20and%20Diasabled-%20Self%20directed%20care%20amendment.PDF. But that is not certain: the Pilot uses a formula to cap the budget available to any recipient. The state's supplemental brief explains that under the Pilot, the FSSA and the care manager determine the aggregate amount of each participant's budget

by taking the person's eligible hours and multiplying that by $41.80 per hour. If Vaughn were to be assigned 24 hours of Pilot services, her daily budget would be $1,003.20. If that amount is not enough to elicit the services Vaughn needs, we could find ourselves right back where we started. That fact, plus the fact that Vaughn is apparently not at present enrolled in the Pilot, persuades us that the Pilot has not mooted this case, and the analysis of the established programs is still important.

The existence of the Pilot underscores the point Indiana has been making all along: it does not have the unilateral authority to make the kinds of modifications to its programs Vaughn wants even if it were so inclined. Both the state's core Medicaid program and its waiver programs must be approved by the federal Center for Medicare and Medicaid Services (CMS), an entity lodged within the Department of Health and Human Services. Granting Vaughn's request to self-direct her care plan in its entirety, whether construed as a modification of the prior-approval program or the A&D waiver program, would have required the FSSA to depart from what CMS has approved for general use. The state argued that it could not depart from its approved programs in the way Vaughn requested and still receive Medicaid reimbursement for the services provided. See 42 C.F.R. § 441.360(d) ("[Federal financial participation] for home and community-based services … is not available in expenditures for … [s]ervices that are not included in the approved State plan and not approved as waiver services by CMS."). Vaughn's requested accommodation, therefore, could be implemented solely with state funds.

The district court, apparently thinking that some reshuffling of Medicaid funds was possible, thought that it was reasonable for Indiana to direct the FSSA to provide whatever care Vaughn needs. We do not read the law and regulations that way. Indiana contends, and we agree, that only if the accommodations comport with federal requirements for Medicaid service approval and funding must it offer them. If, on the other hand, federal requirements preclude the changes Vaughn wants, Indiana need not go outside its approved programs and relinquish federal reimbursement.

Vaughn's second proposed accommodation was to be allowed to hire staff for the level of service she believes most appropriate to her needs, regardless of the qualifications the FSSA or other state regulators believe are necessary to provide certain types of care. For example, even though state officials believe that tracheostomy maintenance and ventilator operation should be performed in a home setting by licensed nurses, Vaughn wants to be able to hire home-health aides or other non-nurses and train them to perform the necessary tasks. This would alleviate the difficulties stemming from a nursing shortage in Indiana and likely also would be cheaper in the long run, because the Medicaid reimbursement rate for home-health aides is less than the rate for licensed nurses. Vaughn's doctor and social worker support this plan.

At the summary judgment stage, the state defended its Medicaid provider qualification standards as a policy choice entitled to deference, rather than as a legal constraint. This is significant because it contributed to the district court's impression that the state had denied Vaughn's proposed accommodation as a matter of discretion. Such an exercise of discre-

tion might well be unreasonable given the integration direction. Certain provisions of Indiana and federal law allow doctors and nurses to delegate tasks to other caregivers, including home-health aides, as long as those caregivers are properly supervised. See, *e.g.*, Ind. Code § 25-23-1-27.1(b)(6) (Indiana law on licensing nurses and other health professionals does not prohibit "performance of tasks by persons who provide health care services which are delegated or ordered by licensed health professionals, if the delegated or ordered tasks do not exceed the scope of practice of the licensed health professionals under Indiana law"); *id.* § 25-23-1-1.1 (defining "registered nursing" as including "delegating tasks which assist in implementing the nursing … regimen"); 42 C.F.R. § 484.80(h)(1)(i) ("If home health aide services are provided to a patient who is receiving skilled nursing …, a registered nurse or other appropriate skilled professional who is familiar with the patient, the patient's plan of care, and the written patient care instructions …, must make an onsite visit to the patient's home no less frequently than every 14 days."). In its summary judgment briefing in the district court, the state left unanswered the critical question whether any provision of law requires that *only* licensed nurses perform the particular tasks in Vaughn's care plan.

If these tasks lawfully can be delegated to a home-health aide or other trained caregiver under a nurse's supervision, but Indiana simply as a matter of policy prefers that they be performed by nurses, then Vaughn's case for an accommodation would be stronger—all the more so because her doctor recommends that Vaughn be allowed to receive treatment at home rather than in a nursing facility even if that means that some of her medical care will be provided by trained non-nurses. *Cf. Radaszewski*, 383 F.3d at 611 ("If variations in the

way services are delivered in different settings were enough to defeat a demand for more community-integrated care, then the integration mandate of the ADA and the Rehabilitation Act would mean very little.").

This means that the central question is whether Vaughn's request to employ less-skilled providers may be granted consistently with federal requirements for program approval and funding. We cannot tell on the present record. We do not know, for example, whether Vaughn's proposal involves enough supervision to satisfy the state's delegation requirements. Nor do we know, under Vaughn's proposed system, how many people would have offered their services, and at what rates of pay. Summary judgment in favor of Vaughn on this point was thus premature. That is enough to require a remand, and the impact of the new Pilot also should be examined first by the district court, in light of our general comments about the program.

### B. Medicaid Act: Promptness

The Medicaid Act requires that medical assistance provided through a state's Medicaid program "shall be furnished with reasonable promptness to all eligible individuals." 42 U.S.C. § 1396a(a)(8). Federal regulations reiterate that this assistance be furnished "promptly to recipients without any delay caused by the agency's administrative procedures." 42 C.F.R. § 435.930(a).

Vaughn argues that the state violated her right to reasonably prompt delivery of Medicaid services because, before the district court's January 2019 injunction and order, she had been institutionalized contrary to her wishes for nearly three years, first in a hospital and then in a nursing home. The state

argued that her continued institutionalization was not the result of the FSSA's administrative procedures or intransigence. Instead, it stemmed from factors beyond the FSSA's control—primarily, a lack of licensed nurses willing to provide Vaughn's required services at Medicaid rates. Echoing its ADA analysis, the district court concluded that "Defendants' own administrative choices—namely, the restrictions they have imposed on Ms. Vaughn's home healthcare provision pursuant to their Medicaid Policy Manual—resulted in their inability to find a caregiver, or combination of caregivers, who can provide Ms. Vaughn's care in a home-based setting."

As we did with respect to Vaughn's ADA and Rehabilitation Act claims, we conclude that Indiana's failure to accommodate Vaughn's request for a modification to the state's Medicaid guidelines was attributable to constraints beyond its control. The state was not required to carve out a special category, ineligible for Medicaid funding, for Vaughn. Without proof that the state could achieve Vaughn's goals in a manner consistent with federal law, summary judgment was thus inappropriate on this claim as well.

### III

We review the district court's grant of a permanent injunction in Vaughn's favor for an abuse of discretion; "however, we review its factual determinations for clear error and its underlying legal conclusions *de novo*." *Lacy v. Cook Cnty.*, 897 F.3d 847, 867 (7th Cir. 2018). Permanent injunctive relief is appropriate if the party seeking the injunction demonstrates "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in

equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Since a permanent injunction is a form of relief on the merits, the plaintiff must also show not just a probability of success on the merits but actual success. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008).

It would be enough to vacate the permanent injunction here on the basis of our conclusion that the district court erred by ruling on the merits in favor of Vaughn. But this case is not over: Vaughn still needs services, and the Pilot has yet to be explored. We therefore conclude with a brief discussion of the permanent injunction the district court entered, in the hope that we can provide some guidance for any further proceedings. See *Atl. Richfield Co. v. Oil, Chem. & Atomic Workers Int'l Union, AFL-CIO*, 447 F.2d 945, 948 (7th Cir. 1971) ("An injunction, though entered on the basis of evidence of past events, is operative in the future. To the extent that relevant facts are properly included in the record, we, therefore, consider them even though they transpired after the entry of the orders being reviewed.")

As we noted earlier, effective May 26, 2020, Indiana launched a pilot program under its general A&D waiver. The Pilot offers Participant Directed Home Care Service (PDHCS) and covers two zip codes in the Indianapolis area, including Vaughn's. Just as Vaughn wanted, it allows participants to select, schedule, train, and supervise their own providers and pay them out of a total budget determined by the FSSA. Participants may hire "either a licensed professional through a home health agency, an independent, licensed professional,

or a non-clinical competency-trained unlicensed profes-
sional" to provide their care, but in exchange for this flexibil-
ity they "must be willing to accept risks and responsibilities
associated with employing their caregiver and directing their
own care" and "sign a waiver liability form."

The parties agree that Vaughn is eligible for this program
and that it incorporates her major proposed modifications to
the earlier program, *i.e.* it would enable Vaughn to self-direct
her care in its entirety and to select and train providers of her
own choosing based on her assessment of their necessary
competencies (assuming that the new budget is high enough
to attract willing providers). Thus, the waiver program
amendment appears largely to resolve the disputes in this
case.

The state emphasizes, however, that the latitude granted
to PDHCS participants is still bounded by other provider-
qualification standards, which are dictated by federal and
state law and prevailing medical standards and cannot be
waived for a Medicaid recipient. See 42 C.F.R. § 484.75(a)
("Skilled professional services are authorized, delivered, and
supervised only by health care professionals who meet the
appropriate qualifications specified under § 484.115 and who
practice according to the [home-health agency's] policies and
procedures."); *id.* § 484.80 (specifying qualifications for home-
health aides participating in federal programs); *id.*
§ 484.115(d) (setting federal standards for home-health aides
participating in federal programs); 405 Ind. Admin. Code
§ 5-29-1(2) ("Services provided outside the scope of a pro-
vider's license, registration, certification, or other authority to
practice under state or federal law" are not covered by Medi-
caid.).

Federal Medicaid regulations allow home-health aides to perform skilled nursing tasks only "as an extension of … nursing services," not independently. 42 C.F.R. § 484.80(g)(3)(ii). Additionally, federal regulations for the Medicaid Home and Community-Based Services waiver program, under which Indiana's A&D waiver program falls, require states to provide CMS with "[a]ssurance that necessary safeguards have been taken to protect the health and welfare of the beneficiaries of the services," including "[a]dequate standards for all types of providers that provide services under the waiver" and "[a]ssurance that the standards of any State licensure or certification requirements are met for services or for individuals furnishing services that are provided under the waiver." *Id.* § 441.302(a)(1)–(2).

These provisions appear to impose some limitations on Vaughn's ability to select providers without regard to their formal qualifications and still have the state pay for their services. If non-nurse caregivers performing medical tasks under a nurse's supervision may be reimbursed with Medicaid funds at appropriate rates, then Vaughn's request to choose her own caregivers is reasonable. If, on the other hand, they cannot be reimbursed by Medicaid, then the accommodation would be unreasonable, because it would force the state to bear the full cost of her care. To be clear, an accommodation that requires the state to provide care at its own expense, outside its federally authorized and reimbursable Medicaid programs, is not a reasonable modification of its Medicaid programs.

We take no position here on the way the Pilot fits within Indiana's Medicaid programs. We note only that these issues

and others may arise if Vaughn chooses to move forward with a proposal under the Pilot.

**IV**

We end with some additional comments about our concerns with the permanent injunction the district court entered and other issues that may need to be resolved on remand. First, as we just noted, it is too soon to say whether the increased flexibility of the Pilot will solve Vaughn's problems. Her overall budget will depend on Medicaid caps, and we do not know at this juncture how far that money will stretch.

This means that the question whether a Medicaid recipient has a private right of action to challenge Medicaid rates as too low to elicit necessary services may come up. *Armstrong* did not have to reach this question, as it dealt only with a lawsuit brought by Medicaid providers. Yet this may be a distinction without a difference, as we speculated in *O.B.* See 838 F.3d at 842. On the other hand, it may be significant in light of the fact that the *Armstrong* Court discussed, but did not overrule, *Wilder v. Virginia Hospital Association*, 496 U.S. 498 (1990) (finding that the Boren Amendment to the Medicaid Act may be privately enforced by health care providers). Since this issue is as yet unexplored in the present case (because the district court found it unnecessary to do so), we prefer to save further consideration for a time when it is necessary.

Whether or not such a private action exists, another problem with the present injunction deserves mention. This case is about Indiana's *Medicaid* program, not its general social-welfare regime. It is thus troublesome for the court to issue an injunction requiring Indiana to furnish Vaughn's care entirely out of its own funds, unreimbursed and unsupplemented by

Medicaid. Today it is Vaughn, but it easily could be someone else tomorrow. How much state expenditure outside the scope of the Medicaid program may a court command? We could understand this kind of order if one of the conditions of the Medicaid program itself required this action, but we cannot find any such provision in the federal statute or regulations.

We say this with great sympathy for people who find themselves in Vaughn's situation. Indeed, never have we seen a time when the advantages of home-based, community-integrated provision of services to the disabled have taken on greater importance. The *New York Times* reports that, "[w]hile 8 percent of the country's [Covid-19] cases have occurred in long-term care facilities, deaths related to Covid-19 in these facilities account for more than 42 percent of the country's pandemic fatalities." *More Than 40% of U.S. Coronavirus Deaths Are Linked to Nursing Homes*, N.Y. TIMES, https://www.nytimes.com/interactive/2020/us/coronavirus-nursing-homes.html (last updated July 23, 2020). In Indiana, where Vaughn lives, 44% of Covid-19 deaths are linked to nursing homes. It is entirely understandable that people strongly prefer to avoid institutional living arrangements.

Nonetheless, our task is only to determine whether Vaughn is entitled to the services she has requested under Indiana's version of the Medicaid program. We have concluded that, as the program was structured before the state adopted its new pilot program, the answer is no. That means that the permanent injunction entered by the district court must be vacated.

Vaughn is entitled to receive at-home care by providers of her choosing only to the extent that, working with the state,

she can craft a program that complies with federal and state law and does not deprive Indiana of the ability to receive its share of federal reimbursement through the Medicaid program for services provided. The state is not obligated to reimburse Vaughn's providers at rates above the approved Medicaid caps, nor must it use funds outside the Medicaid program to comply with a rule about accommodation within the program.

For these reasons, we VACATE the order of summary judgment in favor of Vaughn. In addition, we VACATE the permanent injunction and REMAND for further proceedings consistent with this opinion.