In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 20-1384

WILLIAM LIEBHART and NANCY LIEBHART,

*Plaintiffs-Appellants.*

*v.*

SPX CORPORATION, *et al.,*

*Defendants-Appellees.*

———————————

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 16 cv 700 — **James D. Peterson**, *Chief Judge.*

———————————

ARGUED NOVEMBER 2, 2020 — DECIDED MAY 26, 2021

———————————

Before SYKES, *Chief Judge*, and EASTERBROOK and WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.* This is not the first time we have become involved in the lawsuit that William and Nancy Liebhart have been pursuing against SPX Corporation and two other defendants. The Liebharts contend that SPX contaminated their properties with toxic chemicals in violation of the Resource Conservation and Recovery Act (RCRA), 42

U.S.C. § 6901, and the Toxic Substances Control Act (TSCA), 15 U.S.C. § 2601. In 2018, the district court granted summary judgment to the defendants on causation grounds. *Liebhart v. SPX Corp.* (*Liebhart I*), 16-cv-700-jdp, 2018 WL 1583296 (W.D. Wis., Mar. 30, 2018). We vacated that ruling and remanded based on an error in the legal standard the court applied. *Liebhart v. SPX Corp.* (*Liebhart II*), 917 F.3d 952 (7th Cir. 2019). On remand, the district court again granted summary judgment for the defendants. The Liebharts are back again, this time complaining that the district court erred by refusing to issue an injunction ordering the defendants to clean up the properties that were allegedly contaminated with PCBs (polychlorinated biphenyls).

Although our reasoning differs from that of the district court, we find no reversible error in its ultimate ruling. While the case was pending on remand, the Wisconsin Department of Natural Resources (DNR) authorized and began to supervise clean-up of the site. A permanent injunction is not available as a matter of course; it remains a creature of equity, and so the district court has discretion to decide whether that relief is warranted, even if it has found liability. Although the Liebharts present colorable arguments that the current version of the DNR's plan may not be ideal, more is required to find that a district court abused its discretion by withholding equitable relief in this context. See *LAJIM, LLC v. Gen. Elec. Co.*, 917 F.3d 933, 944 (7th Cir. 2019). Because the Liebharts have not established that there are substantive inadequacies in the state plan or irregularities in the DNR's enforcement of the plan, such that additional oversight is required, we affirm the district court's denial of injunctive relief.

**I**

A

The PCB contamination of the Liebharts' property arose in the middle of the last century. In 1953, Heavi-Duty Electric Company announced plans to convert a building located at 304 Hart Street in Watertown, Wisconsin, into a plant for manufacturing electrical transformers. Part of Heavi-Duty's manufacturing process involved using PCBs. Although their toxicity was not known at that time, PCBs later became suspected carcinogens. Congress eventually banned their manufacture in 1979. Before then, however, liquid PCBs were widely used in industrial fluids for electrical insulation and heat regulation.

For 20 years, Heavi-Duty made transformers at the Watertown plant. Although its operations changed in the 1970s, the plant remained operational until 2004, when the SPX Corporation consolidated its operations and slowly began laying off staff. The plant soon closed its doors and the building remained vacant for the next ten years.

In 2010, SPX hired an engineering consulting firm to conduct an environmental study of the vacant building. That study confirmed that PCBs permeated the property: two-thirds of dust samples and nearly three-quarters of samples taken from the top inch of the concrete flooring showed PCB contamination. The following year, SPX submitted to the U.S. Environmental Protection Agency a proposed plan to remediate the affected areas, and the EPA promptly approved the plan.

This is where our story picks up. Before starting remediation, SPX reassessed the facility's condition and decided that

it was better simply to demolish the building so that the site could be redeveloped from scratch. Accordingly, in 2014 SPX notified the EPA of its demolition plans and its intent to complete a "self-implementing on-site cleanup and disposal of PCB remediation waste" pursuant to 40 C.F.R. § 761.61(a)(3), the implementing regulation for the Toxic Substances Control Act. Its plan called for demolishing the building, removing all concrete flooring, and conducting verification sampling following remediation. The EPA formally approved the plan on February 2, 2015.

By that time, SPX already had retained the services of TRC Environmental Corporation to oversee the demolition; TRC hired Apollo Dismantling to conduct the actual work. The contractors broke ground in January 2015, one month before formal EPA approval.

Demolitions are seldom tranquil endeavors, and this was no exception. Perhaps that would not have been a problem if SPX's facility had been far from human habitation, but that was not the case. Mere feet from the affected site lived the Liebharts and their children. Their residence was located at 1115 and 1117 South Third Street, directly west of SPX's facility at 304 Hart Street. They also owned the properties at 1113 and 1129 South Third Street; they leased the latter properties to other families. All of the Liebhart properties shared a property line with the Hart Street facility.

For weeks, demolition dust gathered on the Liebhart properties. Generally, demolition contractors use dust-suppression methods such as water and misting machines to control dust output. Apollo insists that it did just that, by drawing water from a nearby fire hydrant for dust suppression throughout the demolition; the Liebharts maintain that no

such measures were used. Near the end of February 2015, Mr. Liebhart complained to the two companies and the state agency about the dust invading his property and the potential health issues that it presented.

On April 22, 2015, shortly after the demolition work ended, the DNR ordered SPX to take soil samples from 1113, 1115, and 1117 South Third Street. SPX conducted further sampling in May 2015, November 2015, and in January 2016. These efforts, which involved taking soil from both the top layers and subsurface layers of soil, indicated that PCBs were present in varying concentrations and at varying depths on the Liebharts' properties. Many of the samples exceeded the residential standard established by Wisconsin law for acceptable PCB concentrations.

Later in 2016, SPX (through TRC) began submitting proposed remediation plans to the DNR; those plans proposed to excavate the contaminated soil from the Liebharts' properties. In a technical review letter dated October 26, 2016, the DNR stated that "[t]he extent of contamination must be more thoroughly evaluated to assure that there are not direct contact soil exceedences [*sic*] on the west side of South 3rd Street [across the street from the Liebharts' properties]." The letter listed several deficiencies with the submitted plans and documents and invited TRC (on SPX's behalf) to submit revised documents at its earliest convenience.

Amicable resolution eluded the parties. Two days before the DNR sent the technical review letter to SPX, the Liebharts sued SPX, TRC, and Apollo in the Western District of Wisconsin.

B

The Liebharts' complaint, filed on October 24, 2016, alleged that SPX, TRC, and Apollo contaminated their properties with PCBs. The complaint sought injunctive relief under the Toxic Substances Control Act, 15 U.S.C. § 2601, and the Resource Conservation and Recovery Act, 42 U.S.C. § 6901. The Liebharts contended that mere compliance with the DNR's regulatory framework and guidance was not good enough; the defendants' remediation efforts needed to comply with the U.S. EPA's "PCB Spill Cleanup Policy" found in its TSCA regulation, 40 C.F.R. Subpart G (§§ 761.120–761.135).

Despite the Liebharts' lawsuit, SPX and TRC continued to work with the Wisconsin authorities to develop a plan for the removal of PCB-contaminated soil from the affected properties. Two sets of documents set forth the resulting plans. The first was a draft of a "Pre-Remediation Sampling Plan," which the companies gave to the DNR in August 2017. The Sampling Plan was intended to "refine the limits of the excavation area for costing and scheduling purposes." It also described the process for collecting "additional soil samples … to fully bound the limits of the affected soil." Through a letter dated October 9, 2017, the DNR approved the Sampling Plan "with the following conditions:"

1. To the extent practicable, soil samples must be taken from intervals of less than one foot. For example, the proposed 0–2′ depth samples should be taken from a depth of 0–1′. …

2. Storage of excavated contaminated soil must be performed in accordance with all state and federal rules

> … includ[ing] NR 718.05 Wisc. Adm. Code and 40 CFR 761.65(c)(9).
>
>   * * *
>
> 4. TRC must obtain the relevant [U.S.] EPA approval(s) for the upcoming work.

TRC submitted a revised Sampling Plan later that month, and the Wisconsin DNR approved the revisions in November.

Around the same time, TRC also submitted to the DNR a report entitled "Remedial Action Investigation and Design Report for 1115, 1117, 1129 South 3rd Street and 304 Hart Street ("Remedial Report")." This report, which was mentioned throughout the Sampling Plan, described the soil investigation done during the first round of sampling. It "identified [PCB] concentrations" that exceeded the DNR's permissible residual contaminant level of 0.234 mg/kg in certain areas of the listed properties. The Remedial Report recommended the "most appropriate remedial action to meet state and federal requirements." It also covered how compliance would be verified and how the site would be restored after the remedial action. The letter of October 9, 2017, that DNR sent with respect to the Sampling Plan also included the agency's approval of the Remedial Report.

Meanwhile, the litigation chugged along. On March 30, 2018, the district court ruled against the Liebharts on several matters. First, the court excluded some of the expert reports they offered. The Liebharts' causation expert, John Woodyard, sought to establish that the PCBs found on the Liebharts' properties were attributable to the demolition of the site (as opposed to having historically originated from the plant's earlier operations). The court found Woodyard's testimony to be "conclusory and fundamentally unreliable" and

excluded it entirely. *Liebhart I*, 2018 WL 1583296, at \*5. The court further reasoned that even assuming that the demolition blew some PCBs onto the property, the Liebharts had not shown that these PCBs originated from the demolition, rather than from the historical activities at the plant. It also ruled that even if the Liebharts had accurately attributed a certain amount to the demolition, they had not shown that this amount qualified as "an imminent and substantial danger" as required by RCRA.

In the same order, the court excluded a portion of a report prepared by David Carpenter for the Liebharts on the subject of damages. Carpenter was prepared to testify that "there is no 'safe' level of exposure to PCBs that does not increase the risk of disease." The court found, however, that Carpenter did not support that statement with medical literature and so his opinion was inadmissible. *Id*. at \*5. It refused to allow the Liebharts to amend their complaint to add a claim that the defendants unlawfully buried PCB-contaminated concrete at the site after the demolition. *Id*. at \*7–8. The problem was timeliness: the Liebharts made this request one month after both parties finished briefing summary judgment motions and three months before trial. The court deemed this "far too late."

Based on these rulings, the court granted summary judgment in favor of the defendants. On the RCRA claim, it found that the Liebharts had no evidence that would support a finding of "imminent and substantial danger" because, among other things, they had not demonstrated that they were injured by the PCBs. On the TSCA claim, the court held that the Liebharts had not established that the Act even applied, because they had no evidence that "there *was* a PCB spill of a concentration greater than 50 ppm on their property."

The court also stressed that even if the defendants' demolition violated federal environmental law, it would have declined to grant an injunction because the Liebharts did "not identify any way that SPX's [DNR] plan is deficient or violates federal law." *Id*. at *7. The Liebharts' chief argument against the DNR plan was that SPX needed to comply with the *federal* "PCB Spill Cleanup Policy." But the Liebharts, in the court's view, had failed to explain "how SPX's [state] plan departs from" the federal policy "in any meaningful way," nor had they "explain[ed] why SPX's proposed sampling scheme is substantively inadequate." *Id.*

On appeal, a panel of this court vacated and remanded the district court's decision. We held that the district court had applied too stringent a standard on the RCRA claim. *Liebhart II*, 917 F.3d at 959. An "imminent and substantial endangerment to health," we reasoned, could be demonstrated by showing that "there are PCBs currently on the property that have the *potential* to substantially threaten [human] health at some point in the future if they continue to occupy the premises and prolong their exposure." *Liebhart II*, 917 F.3d at 960–61 (emphasis added). Stated differently, the Liebharts did not need to establish an injury that already had materialized.

We thus instructed the district court on remand to reconsider its ruling on Dr. Carpenter's testimony and to reconsider the propriety of injunctive relief in light of our ruling about potential threats to health. We also invited, but did not order, the court to reevaluate its exclusion of Woodyard's testimony. Finally, we held that the court acted within its discretion when it denied leave to amend.

On remand, the district court largely adhered to its earlier view of the case. It declined to reconsider its decision to

exclude Woodyard's testimony, and it held that Dr. Carpenter
had failed to lay an adequate foundation for his testimony.
Further, the court held that the Liebharts had not "met their
burden to show that the demolition is the source of the con-
tamination on their property, that any contamination caused
by the demolition may present a substantial endangerment to
them, that the defendants are responsible for a PCB spill of
over 50 ppm, or that they meet the requirements for injunctive
relief under the RCRA or the TSCA." *Liebhart v. SPX Corp.*
(*Liebhart III*), 16-cv-700-jdp, 2020 WL 6999229, at \*12 (W.D.
Wis., Feb. 7, 2020).

This brings us to the present appeal. The Liebharts raised
several issues, and SPX has responded with a number of
points. But we find that one issue is dispositive. Even assum-
ing that the Liebharts could get their expert testimony admit-
ted and were able to prove a RCRA or TSCA violation, this
case goes nowhere unless it was an abuse of discretion not to
order permanent injunctive relief. We therefore focus on that
question.

For present purposes, we accept some critical facts. First,
we assume that the Liebharts' properties are contaminated
with PCBs, and that this condition has caused hardship to
them and their children. We also accept that the PCBs on their
property are of the same "species" as those previously identi-
fied in the dust and the concrete flooring of the 304 Hart Street
facility. A chromatogram, or chemical fingerprint, indicated
both to be "Aroclor 1260."  Finally, we note that as far as we
can tell, the Liebharts have not permitted the defendants ac-
cess to any of their properties to carry out additional sampling
(as called for by the Sampling Plan) or to commence the reme-
diation (in accordance with the Remedial Report). SPX's

counsel has tried to negotiate an access agreement to no avail. Without evidence to the contrary, we assume that the Liebharts' properties remain as they were post-demolition.

## II

### A

Permanent injunctive relief is appropriate if the applicant demonstrates "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). The ultimate decision whether to issue such an injunction lies within the discretion of the district court. *EEOC v. AutoZone, Inc.*, 707 F.3d 824, 840 (7th Cir. 2013). We give great deference to the court's decision either to issue or to deny an injunction. *Bowes v. Ind. Sec'y of State*, 837 F.3d 813, 817 (7th Cir. 2016).

Critically, a finding of liability on a defendant's part does not automatically give rise to an entitlement to injunctive relief. To the contrary, an injunction issues "only as necessary to protect against otherwise irremediable harm." *LAJIM*, 917 F.3d at 944; see also *United States v. Bethlehem Steel Corp.*, 38 F.3d 862, 867 (7th Cir. 1994) ("Ordinarily, a court is obligated to conduct an equitable balancing of harms before awarding injunctive relief, even under an environmental statute which specifically authorizes such relief.").

When a suitable remedy is available under state law, it becomes harder to establish the irreparable harm required for injunctive relief. In such cases there is a risk that additional

relief imposed by the federal court may turn out to be duplicative or inconsistent with the ongoing remedy. We faced just such a situation in *LAJIM*, 917 F.3d at 933. There, the Illinois Environmental Protection Agency (IEPA) wanted General Electric to undertake remedial measures on ground-water wells that GE had contaminated with chlorinated solvents. GE had proposed remediating the site through natural attenuation (*i.e.*, letting the toxins dissipate "on their own"). Dissatisfied with that plan, the state attorney general sued GE in state court under the Illinois Environmental Protection Act and obtained a consent order requiring GE actively to treat the site under the supervision of the IEPA. A final "Remedial Action Plan" between IEPA and GE was later formalized. *Id*. at 940.

While this was ongoing, a private plaintiff who purchased the property on which the water wells were located sued GE in federal court under RCRA, seeking a permanent injunction ordering remediation. The district court denied relief, concluding that the plaintiff "had not yet provided the court with the facts supporting [the] assertion that the Consent Order in the state action was deficient and ineffective." *Id*. at 941.

We affirmed, finding that the plaintiff failed to adduce "any evidence that injunctive relief, in addition to what the IEPA had already ordered in the state action, would improve the environment and not cause additional harm." *Id*. at 942. RCRA, we said, "does not require a court-ordered cleanup where the court has not found such action necessary to prevent harm to the public or the environment," *id*. at 949, particularly where a state agency was already supervising a clean-up plan.

These principles are thus not new to the Liebharts' litigation. Our opinion in *Liebhart II* discussed *LAJIM*, see 917 F.3d

at 963, as well as a similar line of cases from the Third Circuit. See, *e.g.*, *Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 399 F.3d 248, 267 (3d Cir. 2005). *Interfaith* presented the opposite situation from the one in *LAJIM*; injunctive relief under RCRA was appropriate despite an ongoing state-run remediation plan because of the defendant's dilatory tactics and the inability of the state environmental agency "to deal effectively with those tactics with respect to the Site's clean-up." *Id*. at 265.

Although *LAJIM* and *Interfaith* arose under RCRA, their general principles apply with equal force to TSCA. To obtain alternative or supplemental injunctive relief under a federal environmental statute when a state environmental plan already addresses the precise relief sought, a private plaintiff normally must establish either some substantive flaw in the state plan (*e.g.*, that it violates federal law or leaves certain hazards unaddressed), or that the state agency tasked with managing and overseeing the plan is unequipped to handle the task or lacks adequate authority to compel compliance. We do not mean to exhaust the possibilities here. Other factors may justify injunctive relief; these simply are common equitable considerations that may inform the inquiry.

Above all, the issuance of injunctive relief remains discretionary. When reviewing the district court's response to such a request, we ask only whether the court abused its discretion. See *Vaughn v. Wathall*, 968 F.3d 814, 824 (7th Cir. 2020). We review the district court's factual determinations for clear error, and we assess its legal conclusions de novo. *Lacy v. Cook County*, 897 F.3d 847, 867 (7th Cir. 2018). With this in mind, we proceed to the Liebharts' objections to the DNR's plan.

B

1. Substantive Adequacy

The Liebharts assert that there are several substantive de-
ficiencies with the state plan. But these are not new points—
they all have been raised in earlier stages of this litigation.
None of them calls into question the soundness of the DNR's
plan. We nonetheless review them briefly, in the hope of put-
ting them to rest.

First, the Liebharts argue that the documents submitted to
the DNR "deceptively omitted" two soil samples—one from
1111 South Third Street and another from 1113 South Third
Street—that showed PCBs outside of the proposed clean-up
zone. But there was no omission, let alone a deceptive one.
Table 3 of the Remedial Report submitted to the DNR includes
those samples. The sample labeled G-16, collected at 1113
South Third Street on April 22, 2015, showed an Aroclor 1260
concentration of 0.0833 ppm. And sample G-18, collected at
1111 South Third Street on November 5, 2015, showed an Aro-
clor 1260 concentration of 0.19 ppm.

Even if the DNR somehow overlooked these two samples
when reviewing the Remedial Report, the samples are not
material. Under the most up-to-date state administrative
guidance, an Aroclor 1260 concentration does not trigger
clean-up duties in non-industrial sites until it reaches a resid-
ual contaminant level (RCL) of 0.243 ppm. See Numerical Soil
Standards, Wisconsin DNR Remediation and Redevelopment
Prog. (Mar. 2017), dnr.wi.gov/files/PDF/pubs/rr/RR052e.pdf
(accessed Apr. 20, 2021) (promulged pursuant to Wis. Admin.
Code chs. NR 700 to 754). Neither sample comes within strik-
ing distance of the state's threshold. And federal law is even

less generous. For "non-liquid PCB remediation waste" (such as soil) in high-occupancy areas, the EPA requires "cleanup" only when the sample concentration exceeds 1.0 ppm. 40 C.F.R. § 761.61(a)(4)(i)(A) (implementing TSCA). Thus, we fail to see how the inclusion or exclusion of the samples at 1111 or 1113 South Third Street makes a difference.

Relatedly, the Liebharts argue that the "discovery of PCBs" on the west side of Third Street should call into question the adequacy of the clean-up plan, which does not address the affected areas across the street. These samples do exceed the Wisconsin DNR's standard of 0.243 ppm, although they do not surpass the federal standard. The problem with the Liebharts' argument, however, is that these samples were obtained because the defendants were complying with the DNR's requests that they improve their delineation of the boundaries of the spill.

Stated differently, the Liebharts would like us to hold that the discovery of additional contamination pursuant to a state plan that ordered such additional characterization of the contamination should be grounds for invalidating that plan as being substantively deficient. That makes no sense: the "discovery" shows instead that the state was on the job. As long as the plan remains iterative and subject to DNR's supervision, there is no reason to invalidate the plan on this basis.

Second, the Liebharts argue that the DNR plan is deficient because it fails to incorporate the U.S. EPA's "PCB Spill Cleanup Policy," which, in their view, requires a "statistically based sampling scheme" to determine "spill boundaries in the absence of visible traces." 40 C.F.R. § 761.125(a)(3). Even assuming that the regulation applies in this case, however, the Liebharts do not tell us how the Pre-Remediation Sampling

Plan or the initial sampling conducted in 2015 fail to incorporate "statistically based" methods. Had the Liebharts alleged that the defendants created their sampling plan by throwing darts at a plat or by intentionally picking the locations least likely to contain contamination, a court might be justified in probing further into the matter. But the state plan gives us no reason to call into question the defendant's use of statistical methods, particularly given the oversight and iterative approvals by the DNR.

Moreover, it is far from clear that the EPA's "PCB Spill Cleanup Policy" creates extrinsic duties at all. While Congress may give federal agencies the authority to promulgate legally binding regulations pursuant to enabling statutes, not every elaboration by a federal agency creates a mandate for private parties. An "enforcement policy" sets forth an agency's priorities and its expected mode of enforcement. While private plaintiffs may collaterally attack the legitimacy of an agency's enforcement policy, see *Heckler v. Chaney*, 470 U.S. 821, 831 (1985), we have never held that a failure to follow an internal enforcement policy somehow translates into a private right of action for one party against another. The EPA indicates that the contrary is true in this instance, stating that "[t]hough the PCB Spill Cleanup Policy is found in the CFR, it is an enforcement policy and not a regulation." Policy Guidance Manuals for Cleanups of Polychlorinated Biphenyls (PCBs) Spills, USEPA, www.epa.gov/pcbs/policy-guidance-manuals-cleanups-polychlorinated-biphenyls-pcbs-spills (accessed Apr. 20, 2021).

Third, the Liebharts point out that the state plan fails to address PCB-contaminated concrete that allegedly was buried at the site of the demolition. Recall that the Liebharts

asked to incorporate this grievance into an amended complaint, and the district court found the amendment untimely. We do not disturb that procedural ruling. Accordingly, allegations of buried concrete remain outside the scope of the immediate litigation and the request for injunctive relief. The district court did not abuse its discretion by declining to consider facts that were not properly before it.

### 2. Administrative Competence

Even a substantively adequate state plan might fail to provide sufficient relief if it exists only on paper. Here, however, there is no indication that the DNR is asleep at the wheel. The record reveals an ongoing, collaborative process between the defendants and the state. Although the Liebharts argue that the defendants misrepresented various facts in their plan proposals, those arguments lack merit. All of the "smoking-gun" discoveries cited by the Liebharts were found precisely *because* the DNR was doing its job. There is nothing in the record that would lead us to believe that the DNR could not adequately supervise the remediation plan.

### III

The district court did not abuse its discretion declining to issue injunctive relief under TSCA or RCRA. We therefore AFFIRM its judgment.