In the

# United States Court of Appeals

## For the Seventh Circuit

_____

Nos. 24-2633, 24-2741, & 24-2770

INDIANA PROTECTION AND ADVOCACY SERVICES COMMISSION, et al.,

*Plaintiffs-Appellees/*
*Cross-Appellants*,

*v.*

INDIANA FAMILY AND SOCIAL SERVICES ADMINISTRATION, et al.,

*Defendants-Appellants/*
*Cross-Appellees*.

_____

Appeals from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:24-cv-00833-TWP-TAB — **Tanya Walton Pratt**, *Judge*.

_____

ARGUED APRIL 8, 2025 — DECIDED AUGUST 11, 2025

_____

Before HAMILTON, LEE, and MALDONADO, *Circuit Judges*.

HAMILTON, *Circuit Judge*. These appeals address Indiana's obligation to provide medically necessary services to medically fragile children. Individual Plaintiffs E.R. and G.S. are two children with severe, complex, and unpredictable medical conditions. Since birth, both children have required

around-the-clock care and supervision by a caregiver trained to meet their complex medical needs. Many of their medical needs require actions ordinarily performed by a trained health care professional. For several years, however, the families of E.R. and G.S. have been unable to secure nurses to attend to their needs at home rather than in an institution. In lieu of other options that would forestall institutional placement, both children's needs have been met by their mothers—their principal caregivers and sole sources of financial support. Both mothers have been trained by their children's medical teams to perform tasks that would ordinarily be performed by a health care professional. In addition to addressing E.R.'s and G.S.'s more complex medical needs, both mothers also provide the 24/7 supervision and assistance with activities of daily living that both children require.

The Indiana Family and Social Services Administration (FSSA) has reimbursed both mothers for providing medically necessary care to their sons through its Medicaid program. Until recently, FSSA paid them for providing "attendant care services," which cover unskilled assistance in performing basic life activities, such as eating, bathing, dressing, and toileting, that E.R. and G.S. cannot perform by themselves. FSSA authorized and paid Plaintiffs' mothers to provide attendant care services through one of its Medicaid waiver programs. The programs are intended to enable individuals who would otherwise require care in an institution to receive services at homes. For years, Plaintiffs have used waiver services to receive their medically necessary care at home from their mothers, who care for them full-time.

A July 2024 policy change by FSSA would have made both mothers ineligible to be paid providers of attendant care services for their children. If allowed to take effect as applied to these Plaintiffs, it would eliminate both mothers' ability to care for their children full-time. Plaintiffs' mothers testified that, if left in place, the July 2024 change would force them to make the difficult decision to have their children institutionalized. The Indiana Protection and Advocacy Services Commission and individual Plaintiffs E.R. and G.S. brought this suit to prevent the July 2024 policy change from going into effect and to obtain an order requiring FSSA to take concrete steps toward securing in-home nurses for both children. Plaintiffs contend that the July 2024 policy change violates the Americans with Disabilities Act's requirement that States administer Medicaid programs "in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). They further allege that the State's failure to make in-home skilled nursing available violates the Medicaid Act.

After briefing and oral argument, the district court entered a preliminary injunction requiring FSSA to pay Plaintiffs' mothers for providing attendant care services until in-home nurses are procured for each child. We affirm and remand for further proceedings. As the district court concluded, Plaintiffs have a high likelihood of succeeding on the merits of their ADA claims. Further, we find no abuse of discretion in the district court's balancing of the equities or its assessment that the public interest is best served by preserving Plaintiffs' access to medically necessary care and enforcing federal antidiscrimination law.

I.    *Factual Background*

    A.  *The Individual Plaintiffs*

We begin by summarizing E.R.'s and G.S.'s medical conditions, caregiving arrangements, and financial circumstances.

       1.  *E.R. and His Family*

E.R. is a six-year-old boy who resides with his mother, Jessica Carter, and his 19-year-old sister. He has a rare genetic disorder called cri-du-chat syndrome that causes chronic lung disease, severe respiratory problems, and epilepsy. His epilepsy causes significant seizures that are not fully controlled by medication. He is also substantially deaf and blind, non-verbal, and non-ambulatory. Although E.R. is six years old, his ailments give him the developmental profile of a nine-month-old. He therefore requires close, 24/7 care and supervision and assistance with all his activities of daily living.

Ms. Carter is E.R.'s primary caregiver, in addition to being solely responsible for supporting E.R. financially. She trained with E.R.'s medical team for two months to learn how to provide the care and supervision he requires on a daily basis. E.R.'s sister has also received some training from E.R.'s medical team. Today, Ms. Carter and E.R.'s sister are the only individuals who can provide the constant care that E.R. requires outside of a hospital or nursing facility.

       2.  *G.S. and His Family*

G.S. is a ten-year-old boy on palliative care who resides with his mother, Heather Knight, and his three minor

siblings.[1] Ms. Knight is G.S.'s primary caregiver, in addition to being solely responsible for supporting G.S. financially. G.S. has a severe form of dysautonomia, a disorder that prevents his body from regulating vital processes, including blood pressure, body temperature, digestion, heart rate, sweating, and breathing. He also has hypoxic-ischemic encephalopathy, a kind of brain damage that affects the central nervous system, and progressive white matter brain loss, which causes developmental and intellectual deficits. In addition, he has Lennox-Gastaut syndrome, a severe condition characterized by repeated seizures. G.S. is nonverbal, quadriplegic, deaf, and severely immunocompromised. Like E.R., he requires close, 24/7 care and supervision and assistance with all his activities of daily living.

B. *Services Available through Indiana's Medicaid Program*

Due to their severe medical needs and family incomes, Plaintiffs E.R. and G.S. are both eligible for services through Indiana's Medicaid program, which is administered by defendant Indiana Family and Social Services Administration. Indiana's Medicaid program is composed of the "State Plan," which covers traditional Medicaid services, and several home- and community-based waiver programs. "Both the state's core Medicaid program and its waiver programs must be approved by the federal Center for Medicare and Medicaid Services (CMS), an entity lodged within the Department of Health and Human Services." *Vaughn v. Walthall*, 968 F.3d 814, 822 (7th Cir. 2020)

---

[1] Palliative care is a medical approach intended to optimize qualify of life and to mitigate the suffering of individuals with serious, complex, and oftentimes terminal illnesses.

Plaintiffs receive services through both the State Plan and Indiana's Health and Wellness Waiver (H&W Waiver). In this suit, they contend that a July 2024 policy change, which would prohibit their mothers from serving as paid providers of attendant care services under the H&W Waiver, violates the integration mandate of the Americans with Disabilities Act (ADA). See 42 U.S.C. § 12132; 28 C.F.R. § 35.130(d). Plaintiffs also argue that FSSA's failure to ensure that they receive home nursing assistance through the State Plan violates the Medicaid Act. We set forth relevant background on those services below.

1.  *Traditional Medicaid Services*

Due to Plaintiffs' various medical conditions and functional limitations, they both require what FSSA calls "skilled" nursing services. Skilled nursing services are health care services that are delegated or ordered by a licensed health professional, such as administering medication, feeding a patient through a gastronomy tube, or monitoring seizure activity. FSSA has approved both Plaintiffs to receive in-home skilled nursing services through the State Plan. G.S. has been approved to receive 80 hours per week of in-home skilled nursing services. E.R. has been approved to receive 40 hours per week of in-home skilled nursing services.

Despite FSSA's approval, it has been years since Plaintiffs' families were able to find nurses to staff their approved skilled nursing hours in their homes. In early 2020, G.S.'s nurse moved out of state to accept a higher paying position. In 2021, E.R.'s nurse did the same. Although Ms. Carter and Ms. Knight have spoken with their sons' case managers at FSSA to explore the possibility of obtaining additional nursing assistance, FSSA has taken few steps to locate a nurse for

either child. In FSSA's view, its only role is to approve or deny a request for nursing services once submitted. Ms. Carter has placed E.R. on waiting lists at numerous nursing agencies but thus far has had no success. Ms. Knight is unaware of any skilled providers available to ensure that G.S. receives the care and supervision that he requires without risking his health.

Nonetheless, both Plaintiffs have skilled nursing needs that must be met, whether at home or in an institution. In the absence of any other viable options for caring for E.R. and G.S. at home, Ms. Carter and Ms. Knight have learned how to meet their sons' skilled needs. Both mothers provide Plaintiffs emergency care for seizures, feed them through gastronomy tubes attached to their abdomens, and monitor them for respiratory distress, among other things. E.R.'s sister also cares for E.R. to give Ms. Carter a chance to sleep. Because Ms. Carter and Ms. Knight are not medical professionals, they cannot be paid for meeting their children's skilled nursing needs.

### 2. *Home and Community-based Services*

E.R. and G.S. are also eligible to receive services through the H&W Waiver, one of Indiana's home- and community-based waiver programs. Waiver programs allow States to diverge from the traditional Medicaid structure by providing community-based services to people who would otherwise need to be institutionalized. See 42 U.S.C. § 1396n(c)(1); *Steimel v. Wernert*, 823 F.3d 902, 906–07 (7th Cir. 2016). Waiver services are intended to supplement, not to replace, the services provided through the State Plan such as in-home skilled nursing. "Participating states have significant discretion in how they craft their waiver programs." *Steimel*, 823 F.3d at 907. They may include any service requested by

the State and approved by the federal government "as cost effective and necessary to avoid institutionalization." 42 C.F.R. § 440.180(b)(9). Two services that Indiana has chosen to provide are at issue in this case.

The first, "attendant care services," is defined as "direct, hands-on and unskilled care" that assists an individual with activities of daily living, such as personal hygiene, like bathing and toileting, and mobility. The second, "structured family caregiving," also covers assistance with activities of daily living. It is designed to facilitate an arrangement in which the waiver enrollee lives with a principal caregiver who provides "unskilled" care and support on a daily basis. The services covered by attendant care and structured family caregiving substantially overlap. The primary difference between the two services is the rates of reimbursement that caregivers earn.

Attendant care is paid currently on an hourly basis at a rate of $34.36 per hour. Structured family caregiving is paid on a per diem basis. The rate is between $77.54 and $133.44 per day, depending on the assessed level of need. Individual caregivers like Ms. Carter and Ms. Knight do not, however, receive the full Medicaid rate. FSSA estimates that individual caregivers receive, at most, 60% of the hourly rate for attendant care and between 65% and 70% of the daily rate for structured family caregiving. Actual compensation may be less than FSSA's estimates, and many caregivers are categorized as independent contractors and therefore lack typical employment benefits

a. *Attendant Care Services under the Aged and Disabled Waiver*

Before the policy changes that led to this lawsuit, E.R. and G.S. were both approved to receive attendant care services through the Aged and Disabled Waiver (A&D Waiver). The A&D Waiver placed an important limit on who was eligible to serve as a paid provider of both attendant care services and structured family caregiving. It prohibited a waiver participant's "legally responsible individual" or "LRI" from serving as a paid provider of either service. Federal regulations define the term "legally responsible individual" to include spouses of recipients and parents of minor recipients. Personal Care Services in a Home or Other Location, 62 Fed. Reg. 47896, 47899 (Sep. 11, 1997). Although Indiana could have chosen to authorize LRIs to serve as paid providers of attendant care under specified circumstances, it did not elect to do so. As a result, LRIs like Ms. Carter and Ms. Knight seemed to be ineligible to serve as paid providers of attendant care under the terms of the A&D Waiver.

Despite the prohibition in the A&D Waiver, however, FSSA for years approved and reimbursed hundreds of LRIs to provide attendant care. G.S. and E.R. were among the A&D Waiver participants whom FSSA approved to receive LRI-provided attendant care. In 2021, FSSA approved Ms. Carter to be reimbursed for providing E.R. 112 hours of attendant care each week. In 2022, FSSA approved Ms. Knight, G.S.'s only attendant care provider, to be reimbursed for providing 84 hours of attendant care each week.

For the last several years, the income that Ms. Carter and Ms. Knight receive for providing attendant care has been their only income. Working as paid providers of attendant care

enabled Ms. Carter and Ms. Knight to care for their sons in their homes. Without it, both mothers would have needed to seek full-time employment outside of their homes. Due to the unavailability of in-home skilled nursing to provide the care and supervision Plaintiffs require, returning to full-time employment outside of the home would have forced both mothers to seek institutional placement for their sons.

     b.  *Attendant Care Services under the Health and Wellness Waiver*

FSSA's practice of reimbursing LRIs for providing attendant care lasted until July 2024. The practice came under fresh review in late 2023 after FSSA discovered a shortfall in its budget for fiscal years 2023, 2024, and 2025 of more than $900 million. While much of that variance was the result of State budget reversions, approximately half stemmed from an unanticipated increase in projected expenditures for the A&D Waiver. The forecasted increase in expenditures was the product of three factors: (1) increased enrollment in the waiver program; (2) a 2023 increase in reimbursement rates; and (3) increased utilization of attendant care services, especially in the pediatric population. FSSA has not determined what percentage of the forecasted expenditure increase is attributable to increased utilization of attendant care provided by LRIs like Ms. Carter and Ms. Knight.

FSSA considered different ways of addressing the forecasted variance without asking the State legislature for additional appropriations. It implemented several cost-containment and sustainability strategies, including some specific to its home- and community-based waiver programs. For beneficiaries under the age of 60, FSSA replaced the A&D Waiver with the Health and Wellness Waiver. Through the H&W

Waiver, FSSA began enforcing the prohibition on LRIs providing attendant care. However, it also authorized LRIs to serve as paid providers of structured family caregiving, which is reimbursed at a much lower rate than attendant care services. Like the A&D Waiver, the H&W Waiver prohibits enrollees from receiving simultaneously both attendant care services and structured family caregiving. On June 4, 2024, after a notice and comment period, CMS approved the newly renamed H&W Waiver. The changes went into effect on July 1, 2024.

II. *Procedural History*

In May 2024, shortly before the new H&W Waiver went into effect, the Indiana Protection and Advocacy Services Commission (IPAS) and E.R. and G.S. through their mothers filed this suit against FSSA.[2] The complaint alleges that the H&W Waiver's prohibition on LRI-provided attendant care violates the ADA and the Rehabilitation Act by placing E.R., G.S., and other IPAS constituents at serious risk of institutionalization. It also alleges that FSSA's failure to make in-home nursing services available with reasonable promptness violates the Medicaid Act. On May 21, Plaintiffs moved for a preliminary injunction to require FSSA to continue reimbursing Ms. Carter and Ms. Knight for providing attendant care to their children at the higher rates that apply to those services.

---

[2] The Indiana Protection and Advocacy Services Commission was created pursuant to federal law to represent, advocate for, and protect the rights and interests of individuals with disabilities. See Ind. Code § 12-28-1-3; 42 U.S.C. § 15001; 42 U.S.C. § 10801; 29 U.S.C. § 794e. While the issues presented in and the ultimate resolution of this case may affect many IPAS constituents, the district court's preliminary injunction and this appeal focus specifically on E.R. and G.S. We therefore do not discuss IPAS further.

To give the district court time to consider Plaintiffs' request for a preliminary injunction, FSSA voluntarily extended the deadline for E.R. and G.S. to transition to the H&W Waiver until September 1, 2024.

After expedited discovery, briefing, and oral argument on Plaintiffs' motion for a preliminary injunction, the district court granted some of the relief Plaintiffs requested. The court found that Plaintiffs were likely to succeed on the merits of their Medicaid Act, ADA, and Rehabilitation Act claims, but that the balance of harms and public interest precluded the court from ordering FSSA to pay Plaintiffs' mothers to provide attendant care. The court reasoned that Plaintiffs' requested relief would cause FSSA irreparable harm by forcing it to violate federal law, putting the State at risk of not receiving federal reimbursement. Nevertheless, the court ordered FSSA "to take immediate and affirmative steps to (1) arrange directly or through referral to appropriate agencies, organizations, or individuals, corrective treatment of in-home skilled nursing services to E.R. for a minimum of forty hours and G.S. for a minimum of eighty hours per week and, (2) reimburse the mothers for providing [structured family caregiving] in conjunction."

Plaintiffs filed an "Emergency Motion to Modify Preliminary Injunction," again seeking an order requiring FSSA to reimburse Ms. Carter and Ms. Knight for providing attendant care. They argued that the district court's order was insufficient to prevent Plaintiffs from being deprived of medically necessary care at home so that they would have to be institutionalized. The court thought that Plaintiffs may have been right that the likelihood of FSSA suffering irreparable harm was low. Nonetheless, it again declined to order Plaintiffs'

requested relief, reasoning that such an order would require FSSA to violate federal law. The court did, however, modify the preliminary injunction to require FSSA to file biweekly status reports about its progress toward obtaining in-home nursing assistance for E.R. and G.S.

Plaintiffs then filed a notice of appeal for the modified preliminary injunction and also sought an injunction pending appeal. For the first time, Plaintiffs argued that 42 C.F.R. § 431.250(b)(2) made federal financial participation available for any payments made to Ms. Carter and Ms. Knight pursuant to a future court order. The district court agreed and, on September 27, entered a new order requiring FSSA to pay Ms. Carter and Ms. Knight for providing attendant care services "in the amount approved by the agency immediately before the policy changes challenged in this litigation took effect on September 1." On October 1, the court entered an amended preliminary injunction specifying that FSSA is to pay Ms. Carter and Ms. Knight for providing attendant care "until in-home skilled nursing services are secured for the Individual Plaintiffs." Defendants filed a notice of appeal on September 30 and an amended notice of appeal after the district court modified its September 27 order. Plaintiffs' appeal and Defendants' cross-appeal were consolidated before this panel. We have appellate jurisdiction under 28 U.S.C. § 1292(a)(1).[3]

_____

[3] The parties dispute which of the district court's orders are properly before us. We agree with FSSA that we may review all the district court's orders, including those filed on September 27 and October 1 after Plaintiffs filed their notice of appeal. We construe the October 1 preliminary injunction as a new injunction, which the district court properly entered after Plaintiffs filed their notice of appeal, and which FSSA timely appealed. A district court may resolve a new motion for a preliminary injunction after a previous injunction has been appealed. *Adams v. City of Chicago*, 135 F.3d

Plaintiffs defend the district court's conclusion that they are likely to succeed on the merits of their Medicaid Act, ADA, and Rehabilitation Act claims.[4] They also defend the October 1 injunction as a proper exercise of the court's equitable authority, although they believe it needs to be modified further to prevent either Plaintiff from experiencing irreparable harm. FSSA argues that Plaintiffs do not have a private right of action to pursue any of their Medicaid Act claims. It further argues that all of Plaintiffs' claims are disguised challenges to the State's Medicaid reimbursement rates and therefore barred by *Armstrong v. Exceptional Child Center*, 575 U.S. 320, 329 (2015). Finally, FSSA argues that Plaintiffs are unlikely to succeed on the merits of their claims and that the balance of equities and public interest weigh against the injunction.

---

1150, 1153–54 (7th Cir. 1998). That is what the district court did here; it relied on a new legal authority to grant a new form of relief that it had not previously ordered. Although a new motion for a preliminary injunction may be barred for other reasons such as collateral estoppel, see *id.* at 1153, FSSA has not made any such argument. As a practical matter, the October 1 injunction superseded the portion of the September 9 order requiring FSSA to pay Plaintiffs' mothers for providing structured family caregiving services. But it did not substantially change the issues on appeal because the district court's refusal to order substantially similar relief was the subject of Plaintiffs' appeal. We therefore proceed to the merits of the appeal and cross-appeal.

[4] Because the relevant provisions of the Rehabilitation Act and its regulations are materially identical to their ADA counterparts, courts construe and apply them in a consistent manner. *Steimel*, 823 F.3d at 909. Going forward, we will refer only to the ADA, but our analysis applies with equal force to Plaintiffs' Rehabilitation Act claims.

We affirm the district court's October 1 injunction and remand for further proceedings consistent with this opinion. We first explain that even if the Supreme Court's recent decision in *Medina v. Planned Parenthood South Atlantic*, 606 U.S. —, 145 S. Ct. 2219 (2025), undermines Plaintiffs' Medicaid Act claims, they may proceed under the ADA and the Rehabilitation Act. Then, we explain why the district court did not abuse its discretion in entering the October 1 injunction ordering FSSA to pay Ms. Carter and Ms. Knight for providing attendant care until FSSA secures in-home nurses for E.R. and G.S.

III. *Private Right of Action for Medicaid Act Violations*

Plaintiffs seek relief under 42 U.S.C. § 1983 for alleged violations of three provisions of the Medicaid Act, 42 U.S.C. § 1396a(a)(8), (a)(10)(A), and (a)(43)(C). Together, these three provisions require Indiana to provide eligible Medicaid beneficiaries specified kinds of "medical assistance," including skilled in-home nursing care, with "reasonable promptness." 42 U.S.C. § 1396a(a)(8); see *O.B. v. Norwood*, 838 F.3d 837, 839 (7th Cir. 2016). FSSA challenged the use of section 1983 to enforce only section 1396a(a)(8), even though sections 1396a(a)(10)(A) and (a)(43)(C) impose overlapping obligations on the State.

When this appeal was originally briefed, all of Plaintiffs' Medicaid Act claims were legally viable under Seventh Circuit precedent. We have long held or assumed that these Medicaid Act provisions are privately enforceable through a section 1983 action. See *Bontrager v. Indiana Family & Soc. Servs. Admin.*, 697 F.3d 604, 607 (7th Cir. 2012) (holding that section 1396a(a)(10)(A) is privately enforceable through section 1983);

*O.B.*, 838 F.3d 837 (assuming that sections 1396a(a)(8), (a)(10)(A), and (a)(43)(C) are privately enforceable).

The Supreme Court's recent decision in *Medina v. Planned Parenthood* may well have undermined the availability of section 1983 to enforce these portions of the Medicaid Act. In *Medina*, the Court wrote that *Gonzaga University v. Doe*, 536 U.S. 273 (2002), sets out the proper method for determining whether a plaintiff may bring a section 1983 suit to enforce a provision of spending clause legislation. 606 U.S. at —, 145 S. Ct. at 2232–34. To enforce such a spending clause provision through a private plaintiff's section 1983 action, the statute must "*unambiguously* confer individual federal rights" on the party seeking to sue. *Id.* at 2233, quoting *Health & Hospital Corp. of Marion County v. Talevski*, 599 U.S. 166, 180 (2023). Applying that standard, *Medina* held that the Medicaid Act's any-qualified-provider provision, 42 U.S.C. § 1396a(a)(23)(A), is not privately enforceable under section 1983. *Id.* at 2239. The Court relied primarily on the lack of "clear and unambiguous 'rights-creating language'" in section 1396a(a)(23)(A), *id.* at 2235, quoting *Talevski*, 599 U.S. at 186, but it also invoked some features of the Medicaid Act common to all the provisions of section 1396a, including those relied upon by Plaintiffs. *Id.* at 2235–36. The Court also expressly repudiated the reasoning of *Wright v. City of Roanoke Redevelopment & Housing Auth.*, 479 U.S. 418 (1987), and *Wilder v. Virginia Hospital Ass'n*, 496 U.S. 498 (1990). See *Medina*, 606 U.S. at —, 145 S. Ct. at 2233–34.

Although the *Gonzaga* test as applied in *Medina* and *Talevski* is a "demanding bar," *id.* at 2233, quoting *Talevski*, 599 U.S. at 180, some provisions of section 1396a(a) may yet satisfy it. This is not the right case, though, to decide whether sections 1396a(a)(8), (a)(10)(A), or (a)(43)(C) clear that hurdle. The

ADA indisputably gives Plaintiffs a cause of action to challenge the H&W Waiver's terms as a violation of the ADA's integration mandate. See 42 U.S.C. § 12133 (incorporating by reference 29 U.S.C. § 794a; authorizing suit against public entities by "any person alleging discrimination on the basis of disability"); *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 590 n.4 (1999). The integration mandate is sufficiently broad to justify the district court's October 1 injunction ordering FSSA to pay Plaintiffs' mothers for attendant care until in-home nursing services can be procured. District courts may craft injunctions that are "broad enough to be effective." *Republic Technologies (NA), LLC v. BBK Tobacco & Foods, LLP.*, 135 F.4th 572, 587 (7th Cir. 2025), quoting *Russian Media Group, LLC v. Cable America, Inc.*, 598 F.3d 302, 307 (7th Cir. 2010). The combination of the practical lack of available in-home nursing care and the H&W Waiver's prohibition on LRI-provided attendant care creates the serious risk of institutionalization that triggers the integration mandate here. See *Steimel*, 823 F.3d at 914 (integration mandate applies when State policies place individuals with disabilities "at serious risk of institutionalization"). The district court could therefore tailor its injunction to order relief under the ADA until in-home nursing care becomes available, even in the absence of a viable Medicaid Act claim.

We say no more here about whether sections 1396a(a)(8), (a)(10)(A), and (a)(43)(C) of the Medicaid Act may be enforced through a section 1983 action. Those are issues with high stakes under other circumstances, and they should be decided in cases in which those issues will be fully litigated and will affect the outcomes.

As a result, we consider only Plaintiffs' ADA claims below. On remand, the district court may consider in the first instance whether Plaintiffs' Medicaid Act claims are still viable under *Medina*. If the court decides that these claims are not viable, it will be best positioned to modify the terms of its injunction to the extent equity might require. Regardless of its decision, both sides will have another opportunity to appeal an adverse ruling and to brief that issue to this court.[5]

IV. *The October 1 Preliminary Injunction*

Although all the district court's orders are properly before us, for clarity's sake, we focus our analysis on the October 1 preliminary injunction. "A preliminary injunction is 'an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it.'" *Finch v. Treto*, 82 F.4th 572, 578 (7th Cir. 2023), quoting *Cassell v. Snyders*, 990 F.3d 539, 544 (7th Cir. 2021). "To obtain a preliminary injunction, a plaintiff must show that (1) he has some likelihood of success on the merits of his claim; (2) traditional legal remedies are inadequate; and (3) he would suffer irreparable harm without preliminary injunctive relief." *Id.* "If the plaintiff establishes these threshold requirements, then the court must balance the equities, weighing the harm to the moving party if the

---

[5] After *Medina* was decided, IPAS filed a letter pursuant to Federal Rule of Appellate Procedure 28(j). It raised the possibility that IPAS may be able to pursue its Medicaid Act claims through statutory vehicles other than section 1983. Because Plaintiffs' Medicaid Act claims were clearly viable under pre-*Medina* circuit precedent, the parties did not initially brief whether a right of action other than section 1983 authorizes IPAS to pursue Medicaid Act claims on behalf of its constituents. We need not resolve that question at this time. On remand, the district court will have the opportunity to consider this issue in the first instance.

requested injunction is denied against the harm to the non-moving party and the public—including third parties—if it is granted." *Id.* The party seeking a preliminary injunction bears the burden of showing that it is warranted. *Id.*

We review the district court's factual findings for clear error and its legal conclusions de novo. *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 539 (7th Cir. 2021). The ultimate decision to grant or deny preliminary injunctive relief is committed to the sound discretion of the district court. *Wesley-Jessen Div. of Schering Corp. v. Bausch & Lomb Inc.*, 698 F.2d 862, 864 (7th Cir. 1983). Our review of the October 1 injunction is therefore limited. Absent a clear error of fact or law, the district court's balancing of equities and assessment of the public interest is entitled to significant deference. *Finch*, 82 F.4th at 578; *Cassell*, 990 F.3d at 545.

Here, the district court determined that Plaintiffs had shown a high likelihood of success on the merits of their ADA claims and had shown irreparable harm in the form of the denial of medically necessary care. It then held that the balance of equities and public interest weighed in favor of enjoining FSSA to "allow the Individual Plaintiffs to continue receiving medically necessary attendant care services from their mothers in the amount approved by FSSA immediately before the policy changes challenged in this litigation took effect on September 1, 2024, until in-home skilled nursing services are secured for the Individual Plaintiffs." We agree.

A.  *Likelihood of Success on ADA Claims*

Title II of the ADA prohibits public entities such as FSSA from excluding or discriminating against qualified disabled individuals in the provision of public services. 42 U.S.C.

§ 12132. Congress further provided that unjustified segregation of disabled individuals amounts to an actionable form of discrimination. *Olmstead*, 527 U.S. at 600, citing 42 U.S.C. § 12101(a)(2), (a)(5). That is so for two reasons. "First, institutional placement of persons who can handle and benefit from community settings perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life." *Id.* "Second, confinement in an institution severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment." *Id.* at 601. Some of the aspirations enshrined in these policies may seem lofty for the young Plaintiffs before us. But for them too, Title II serves a vital purpose: enabling them to receive public services without relinquishing close contact with their parents and siblings.

Consistent with Congress's desire to prevent the unnecessary confinement of disabled individuals in institutions, the regulations implementing the ADA contain an integration mandate. The integration mandate provides: "A public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). The "most integrated setting appropriate" is defined as "a setting that enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible." 28 C.F.R. pt. 35, app. B, subpt. B. § 35.130. The integration mandate, however, does not impose an "unqualified obligation" on public agencies. *Radaszewski ex rel. Radaszewski v. Maram*, 383 F.3d 599, 607 (7th Cir. 2004). "Although an agency must make such modifications as are 'reasonable' in order to avoid unduly segregating the

disabled, it is relieved of that obligation if it can show 'that making the modifications would fundamentally alter the nature of the service, program, or activity.'" *Id.*, quoting 28 C.F.R. § 35.130(b)(7)(i).

In *Olmstead*, the Supreme Court applied the integration mandate to Medicaid services. It held that the integration mandate requires States to provide community-based treatment for individuals with disabilities if three conditions are met. 527 U.S. at 607; see *Radaszewski*, 383 F.3d at 608. First, the State's treatment professionals must find that community-based treatment is appropriate for the affected individual. Second, the affected individual must not oppose community-based treatment. Finally, it must be the case that community placement can be reasonably accommodated, taking into account the State's resources and the needs of others with similar disabilities. *Olmstead*, 527 U.S. at 607. We have acknowledged that the third element "'represent[ed] the thinking of only a plurality of the Court,' while the first two commanded a majority." *Vaughn v. Walthall*, 968 F.3d 814, 819 (7th Cir. 2020), quoting *Steimel*, 823 F.3d at 914–15. "Nonetheless, the concurring opinions made 'clear that some version of the "reasonable modifications" provision—and its flip side, the fundamental-alteration defense—must be taken into account before deciding that the integration mandate was violated.'" *Id.*, quoting *Steimel*, 823 F.3d at 915.

Plaintiffs assert that the State's refusal to authorize LRIs to provide attendant care violates the integration mandate because it denies E.R. and G.S. an existing benefit that would enable them to continue receiving care at home instead of in an institution such as a nursing home. FSSA resists that conclusion on two grounds. First, it claims that the H&W

Waiver's prohibition on attendant care provided by LRIs does not trigger the integration mandate at all because it does not place E.R. or G.S. at serious risk of institutionalization. FSSA also argues that authorizing LRI-provided attendant care would "fundamentally alter" the H&W Waiver. On this record, given the district court's well-supported factual findings, neither of FSSA's arguments is persuasive.

### 1. *Serious Risk of Institutionalization*

In *Steimel*, we explained that disabled individuals need not be institutionalized before they can "challenge an allegedly discriminatory law or policy that threatens to force them into segregated isolation." 823 F.3d at 912, quoting *Fisher v. Oklahoma Health Care Auth.*, 335 F.3d 1175, 1181 (10th Cir. 2003). The integration mandate can apply whenever a State administers Medicaid in a manner that places disabled individuals at "serious risk of institutionalization." *Id.* at 914. The district court made a factual finding that FSSA's July 2024 policy change placed both E.R. and G.S. at serious risk of institutionalization. We review that finding for clear error. See *Life Spine*, 8 F.4th at 539.

In finding that the prohibition on LRI-provided attendant care put Plaintiffs at serious risk of institutionalization, the district court carefully examined the record and made the following subsidiary findings. First, given Plaintiffs' medical needs and functional limitations, they cannot be left with a caretaker who is unfamiliar with or incapable of meeting their skilled needs for any period of time. Second, right now, only Plaintiffs' family members are trained to handle their full array of medical needs. Third, if Ms. Carter and Ms. Knight cannot serve as paid providers of attendant care for their children, they will have no choice but to seek outside

employment to meet the basic needs of their families. Finally, in that case, they will also be forced to seek institutional placement for their children because other home-based and community-based services are insufficient to ensure that their sons' complex and unpredictable needs are met.

We find no clear error in any of these subsidiary findings or the court's finding that the H&W Waiver's prohibition on LRI-provided attendant care would place E.R. and G.S. at serious risk of institutionalization. To the contrary, the court's findings are amply supported by the record. FSSA's arguments fail to come to terms with the inability of other available services to meet either Plaintiff's needs.[6]

FSSA first argues that E.R. and G.S. do not require what it characterizes as "direct, hands-on care" for 24 hours each day. But as the district court found, FSSA's litigating position is contradicted by the eligibility screenings the State completed for E.R. in 2022 and G.S. in 2023. Those screenings note that Plaintiffs require "24 hours a day supervision and/or direct assistance … to maintain safety." The court also did not err by

---

[6] FSSA attacks the affidavits of Ms. Carter and Ms. Knight as "self-serving." Most affidavits from parties and their allies, including those submitted by FSSA in this case, are self-serving in that they try to support the submitting party's legal arguments. See *Hill v. Tangherlini*, 724 F.3d 965, 967 (7th Cir. 2013) (collecting cases). The federal rules do not prohibit or give lesser weight to self-serving affidavits based on personal knowledge. We have repeatedly emphasized that the term "self-serving" should not be used to "denigrate perfectly admissible evidence." *Id.* Ms. Carter's and Ms. Knight's affidavits contain key information about their children's medical histories and needs, their financial circumstances, and their ongoing attempts to seek Medicaid services. Their testimony is grounded in their personal knowledge and years of experience caring for their children under difficult and at times dire conditions.

crediting the assessments of Plaintiffs' mothers and treating physicians over that of FSSA's chief medical officer, Dr. S. Maria Finnell, who has never examined either Plaintiff.

Even if Plaintiffs did not need "direct, hands-on care" at all times, that would not undermine the district court's key finding that E.R. and G.S. simply cannot be left in the care of someone who is not capable of meeting their skilled nursing needs. That finding explains why Plaintiffs' mothers, and not unskilled home-health aides, must provide Plaintiffs' attendant care to preserve Plaintiffs' health and safety. Despite some handwringing about whether Plaintiffs require skilled nursing services every moment of every day, Dr. Finnell's affidavit is fully consistent with that part of the district court's findings. As Dr. Finnell acknowledges, both children have severe and unpredictable medical needs that may produce a medical emergency requiring skilled aid at any moment.

The State next argues that Plaintiffs' attendant care hours may be replaced with structured family caregiving hours. The district court explained why this argument is not persuasive. Ms. Carter and Ms. Knight are currently the only people capable of providing the full-time care their children require at home. The court explained in detail why it would not be feasible for Ms. Carter and Ms. Knight to transition to structured family caregiving: the reimbursement rate for structured family caregiving is too low to be the sole source of income for either family. If Ms. Carter and Ms. Knight were unable to serve as paid providers of attendant care, they would need to seek full-time employment outside the home to meet their families' basic needs and their children's heightened needs.

None of these findings is clearly erroneous. In practice, then, neither Plaintiff can replace attendant care hours with

structured family caregiving hours staffed by their mothers. The theoretical availability of structured family caregiving hours does nothing to prevent either Plaintiff from being institutionalized. See *Waskul v. Washtenaw County Community Mental Health*, 979 F.3d 426, 462 (6th Cir. 2020) (reversing dismissal when complaint allowed for inference that plaintiff would be "at serious risk of institutionalization if his guardian is unable to continue caring for him due to her dire financial situation").

FSSA's final argument is that other services—specifically, in-home skilled nursing and public schools—could fill the gap left by the inability of Ms. Carter and Ms. Knight to care for their children while they seek and obtain full-time employment. But this argument too relies on mere theoretical possibilities rather than evidence of alternative services that are currently available to meet Plaintiffs' medical needs at home. FSSA begins by faulting Plaintiffs for failing to use their approved skilled nursing hours—the same hours that Plaintiffs seek to staff through their Medicaid Act claims. FSSA relies on the fact that the State has approved skilled nursing hours for both Plaintiffs and ignores entirely the evidence showing that Plaintiffs and FSSA have not been able to find nurses who are actually available and willing to staff those hours.

The State next contends that Plaintiffs are failing to take full advantage of resources that are supposed to be available through the public school system. The State points out that Plaintiffs are entitled to continuous nursing services under the Individuals with Disabilities Education Act (IDEA). See 20 U.S.C. §§ 1401(26), 1412; *Cedar Rapids Community Sch. Dist. v. Garret F. ex rel. Charlene F.*, 526 U.S. 66, 70, 79 (1999) (holding

that under IDEA, school district was required to provide
continuous one-on-one nursing services that ventilator-
dependent plaintiff needed to remain in school). The district
court found, however, that the public schools near E.R. and
G.S. are unable or unwilling to provide continuous nursing
services. Unable to contest the evidence supporting the
district court's finding that continuous nursing services are
not actually available to either child, FSSA simply emphasizes
that public schools have an obligation to provide such
services under the IDEA. It then goes on to suggest that there
is no reason that these children—with their limited mobility,
their impaired vision and hearing, their intellectual and
developmental deficits, and their frequently life-threatening
medical conditions—should not attend school to the same
extent as children without disabilities.

To state FSSA's argument is to refute it. E.R. and G.S. can-
not attend school in the same manner and at the same fre-
quency as any other child. Even if either child could attend
school more regularly, he would be excluded from doing so
due to the unavailability of nursing services capable of keep-
ing him safe and healthy during school hours. Without pars-
ing the allocation of responsibility under the IDEA as between
the State itself and the local public school system, we will as-
sume for the sake of argument that FSSA might bring the pub-
lic school system into the case, perhaps as a third-party de-
fendant. That possibility does not show that the district court
erred by focusing on the services that might actually be avail-
able to prevent E.R. and G.S. from being institutionalized.

### 2. *Olmstead Analysis*

Having found no clear error in the district court's finding
that Plaintiffs are at serious risk of institutionalization, we

move on to the *Olmstead* analysis. FSSA contests only the third prong of the *Olmstead* test—whether LRI-provided attendant care is a reasonable accommodation or instead would be a fundamental alteration of the H&W Waiver. It is the State's burden to establish its fundamental-alteration defense. See *Steimel*, 823 F.3d at 916. To that end, FSSA makes two arguments. It claims (1) that LRI-provided attendant care is a new service and (2) that the cost of providing it is fiscally unsustainable. At this stage, neither argument is persuasive. Like the district court, we think that Plaintiffs have shown a high likelihood of succeeding on their claims that the H&W Waiver's prohibition on LRI-provided attendant care violates the integration mandate.

### a. *New Service*

FSSA's principal theory is that LRI-provided attendant care is a "new service" that should count as a "fundamental alteration" to its Medicaid program. It cites *Radaszewski v. Maram*, which recognized that States are "not obligated to create new services in order to enable an institutionalized individual to live in a more integrated setting." 383 F.3d at 609. Closer attention to the facts and holding of *Radaszewski*, however, shows that Plaintiffs are not seeking a new service.

In *Radaszewski*, the 21-year-old plaintiff sought continuous private-duty nursing that would enable him to remain at home instead of being institutionalized in a hospital. *Id.* at 600. At that time, the State generally did not provide private-duty nursing to people over the age of 20. *Id.* at 601–02. The plaintiff could obtain some private-duty nursing through a cost-limited waiver program for adults, but the applicable "service cost maximum" would not cover the 24/7 nursing care that he needed to remain at home. *Id.* at 602–03.

Nonetheless, we rejected the State's argument that it was entitled to judgment on the pleadings based on its argument that private-duty nursing was an entirely new service. The State conceded that if the plaintiff were placed in an institution, it would be required to provide him with the level of care that he needed in order to survive. *Id.* at 611. The plaintiff alleged that if he were institutionalized, he would require a more care-intensive setting than a nursing home, such as a hospital, to meet his need for "constant, one-on-one care." *Id.* at 610. We reasoned that private-duty nursing might be a reasonable modification to the form of existing services, rather than a new service, if the plaintiff could show that a private-duty nurse would provide the same level of care as a care-intensive unit in a hospital. *Id.* at 611. The care would be delivered differently in the plaintiff's home, with a private-duty nurse replacing a hospital staff. But the substance of the care—"constant monitoring and continuous skilled assistance in accomplishing basic bodily functions"—would remain the same. *Id.*

Although *Radaszewski* was about the adaptation of institutional services to community-based settings, the same general principles apply where, as here, a plaintiff seeks an accommodation in the form of a modification to a service already delivered in a community setting. An unreasonable limit on a home- or community-based service that places a disabled individual at serious risk of institutionalization is just as capable of violating the integration mandate as a State's refusal to modify a service ordinarily delivered in an institutional setting. To determine whether a plaintiff is requesting a new service or only a modification to the way an existing service is delivered, *Radaszewski* instructs us to look at the substance of the care, not the form, method, or provider.

See *id.* at 611 ("But so long as it is possible for the plaintiff to show that the services he seeks to receive at home are, in substance, already provided in the institutional setting, then the State is not entitled to judgment on the pleadings based on the argument that the services would take on a different form or method if provided in a community setting."). Under that standard, Plaintiffs are not seeking a new service here.

FSSA already provides the exact service that Plaintiffs seek in the exact form that Plaintiffs seek it in, and it has already approved both Plaintiffs to receive it. Removing the prohibition on LRIs serving as paid providers of attendant care for these Plaintiffs does not change the substance of the service as defined by the H&W Waiver. It merely gives Plaintiffs access to an existing benefit that has been granted to other disabled individuals, and one that FSSA agrees Plaintiffs need and for which they qualify. See *Steimel*, 823 F.3d at 913 (no fundamental alteration where plaintiffs sought "access to existing benefits available under [the waiver programs]—benefits that [had] been granted to some persons with disabilities, but not to them"); *Radaszewski*, 383 F.3d at 611–12 ("the fact that the State already provides for some private-duty nursing tends to belie the notion that providing such care … would require the State to alter the substance of its Medicaid programs by creating an entirely 'new' service"); cf. *Rodriguez v. City of New York*, 197 F.3d 611, 618–19 (2d Cir. 1999) (neither ADA nor Rehabilitation Act compelled State to offer safety monitoring to persons with mental disabilities so that such individuals could remain at home, where safety monitoring was not an

existing personal care service that city offered through its Medicaid program).[7]

FSSA cites *Vaughn v. Walthall* as support for its argument that LRI-provided attendant care is a new service. But in *Vaughn*, we evaluated the reasonableness of an accommodation very similar to the one requested by Plaintiffs and came to a different conclusion. The *Vaughn* plaintiff requested the ability to hire and train non-nurses to perform skilled tasks that the State allowed only licensed nurses to perform. 968 F.3d at 823. We explained that if the relevant tasks could be lawfully delegated to a trained caregiver, "but Indiana simply as a matter of policy prefers that they be performed by nurses," then the State's "exercise of discretion might well be unreasonable given the integration direction." *Id.* Because it was unclear, though, whether non-nurses could lawfully perform skilled care under State and federal law, we remanded the case to the district court for further fact-finding. *Id.* at 824

Here, unlike in *Vaughn*, FSSA explicitly acknowledges that it could authorize LRIs to perform attendant care consistent with State law and federal requirements for waiver program approval and funding. The fact that Indiana could allow LRIs

---

[7] In this court, FSSA renews its argument that Plaintiffs are seeking a new service because they want to be paid for performing skilled tasks outside of the scope of attendant care. This argument is not supported by the record. At the preliminary injunction hearing, Plaintiffs' counsel explicitly denied that Plaintiffs are seeking to be reimbursed for providing skilled care. Counsel asserted that Plaintiffs are seeking reimbursement only for attendant care exactly as that service is defined in the State's waiver document. The fact that Plaintiffs have complex medical needs explains why their mothers, and not untrained caretakers, must provide their attendant care. It does not transform LRI-provided attendant care into a new service within the meaning of *Radaszewski*.

to provide attendant care but has simply chosen not to do so makes Plaintiffs' case for an accommodation stronger. See *id.* at 823. Authorizing a different, unambiguously qualified provider to perform an existing non-skilled service is just the kind of minor modification to an existing service that the integration mandate can require.

At bottom, FSSA's argument appears to be that LRI-provided attendant care is a new service merely because it is not currently permitted under the H&W Waiver. In *Steimel v. Wernert*, we rejected the same kind of circular objection to changing the eligibility criteria of a waiver program: "After all, the state creates the waiver programs, and therefore those programs' eligibility criteria. If the state's own criteria could prevent the enforcement of the integration mandate, the mandate would be meaningless." 823 F.3d at 916. Likewise, the integration mandate would be an empty promise if a State's policy choices regarding the services it provides were insulated from judicial review under the ADA merely because they were formalized in the State's Medicaid documents. LRI-provided attendant care is not currently authorized by the H&W Waiver, but if Plaintiffs prevail in this suit, the district court could enter a permanent injunction requiring FSSA to amend the H&W Waiver. The fact that Plaintiffs' requested relief may eventually require the State to amend its waiver does not transform an otherwise reasonable accommodation into a new service. To hold otherwise would enable the State to "avoid the integration mandate by binding its hands in its own red tape." *Id.* at 916.

### b. *Fiscal Sustainability*

FSSA also argues that amending the H&W Waiver to authorize LRI-provided attendant care would be fiscally

unsustainable. It contends that a permanent injunction would impair its ability to mitigate the effects of its anticipated budget deficit and would therefore result in interruptions to Medicaid services.

A State's resource constraints are relevant to the fundamental-alteration inquiry. In *Olmstead*, the plurality explained that a State may establish its fundamental-alteration defense by showing that "in the allocation of available resources, immediate relief for the plaintiffs would be inequitable, given the responsibility the State has undertaken for the care and treatment of a large and diverse population of persons with mental disabilities." 527 U.S. at 604. However, neither the plurality nor the concurring Justices suggested that a State's fiscal problem, by itself, justifies any restriction on an existing, medically necessary service. As other courts have recognized after *Olmstead*, a State's reasonable attempt to solve a fiscal problem may still violate the integration mandate. See, e.g., *Pashby v. Delia*, 709 F.3d 307, 323–24 (4th Cir. 2013) (collecting cases for the premise that "although budgetary concerns are relevant to the fundamental alteration calculus, financial constraints alone cannot sustain a fundamental alteration defense"); *Fisher*, 335 F.3d at 1182–83. States are not required, however, to make an accommodation that would be so costly or would so disrupt the allocation of available resources that it would compel the State to alter the substance of the services it provides to other disabled Medicaid beneficiaries.

On this record, FSSA has not yet shown that amending the H&W Waiver to authorize LRIs to provide attendant care would either solve its fiscal problem or be inequitable. Regarding its fiscal situation, FSSA has not shown that

prohibiting LRI-provided attendant care actually saves the State any money. As the district court observed, this case is not about *how many* services an enrollee may receive. It is only about *whom* FSSA is willing to pay to provide those services. One curious feature of FSSA's position here is that if E.R. or G.S. had any other family member or family friend qualified and willing to provide the full-time care they need to remain at home, FSSA would have no problem reimbursing those providers at the higher attendant care rates. If E.R. or G.S. had less extreme ailments that did not place them in danger if supervised part of the day by a home-health aide incapable of meeting their skilled needs, FSSA would have no problem reimbursing their providers. If Plaintiffs' families could find nurses willing to work in their homes, FSSA would not hesitate to pay for home nursing at a cost that is nearly identical to the cost of attendant care. And, of course, FSSA would also have no objection to placing both Plaintiffs in institutions that would be far more expensive than home-based care.

In other words, the State is willing to provide the services and care that Plaintiffs require, and it is willing to spend as much—or more—as it would cost to reimburse Ms. Carter and Ms. Knight to do so in the form of attendant care. Even though FSSA justifies the prohibition on LRI-provided attendant care as a cost-containment strategy, it has provided no evidence that the limitation would actually reduce the expense of Plaintiffs' care. Given the unavailability of other services, it appears the restriction would eventually push Plaintiffs into nursing homes, which are significantly more costly than home-based care—even when we factor in the rise in FSSA's expenditures for home-based care. If even a substantial increase in the cost of a plaintiff's care cannot defeat a Title II claim, see *Radaszewski*, 383 F.3d at 614,

evidence that a plaintiff's request would cost the State the same or less than *every* other alternative, including institutionalization, does not establish a fundamental-alteration defense.

Although our analysis highlights the cost of providing care to E.R. and G.S., we are cognizant of the need to consider the cost of authorizing LRI-provided attendant care for all eligible waiver enrollees. Looking only at the cost of changing Plaintiffs' care "would be unfair to the state and fail to give it the leeway for which [the concurring *Olmstead* Justices] called." *Steimel*, 823 F.3d at 915, citing *Olmstead*, 527 U.S. at 603 (plurality op. of Ginsburg, J.) ("If the expense entailed in placing one or two people in a community-based treatment program is properly measured for reasonableness against the State's entire mental health budget, it is unlikely that a State, relying on the fundamental-alteration defense, could ever prevail."). Our analysis applies equally when we look at the cost of providing care to all individuals with disabilities comparable to Plaintiffs. If other waiver recipients need to seek in-home skilled nursing services or institutionalization as a result of the prohibition on LRI-provided attendant care, the cost of their care would rise in the way explained above.

As for the services that the State provides to other Medicaid beneficiaries, FSSA invokes a parade of horribles to show that authorizing LRI-provided attendant care would be inequitable. It hypothesizes that it may have to limit the H&W Waiver in various ways or even eliminate the waiver program entirely. It relies on the affidavit of FSSA's Medicaid Director, Cora Steinmetz, who listed, without any explanation, several options of varying gravity that FSSA *might* take if the district court enters a permanent injunction. That list includes the

possibility of seeking additional budget augmentation or appropriations from the State Budget Agency and the Indiana legislature. That indicates to us that, at this time, all options are on the table. FSSA's unexplained and unsupported assertions about the options a permanent injunction might lead it to consider are too speculative to sustain its fundamental-alteration defense. They do not show that authorizing attendant care from LRIs would compel cutbacks in services to other Medicaid waiver participants or be otherwise inequitable.

Beyond Steinmetz's affidavit, FSSA's experience to date with the H&W Waiver tends to undermine its suggestion that it would be either impossible or undesirable for FSSA to authorize LRI-provided attendant care while staying within its fiscal constraints. As of July 1, 2024, FSSA had received transition service plan updates for most pediatric waiver enrollees. Of those enrollees, more than 68% have transitioned to structured family caregiving, and many remaining enrollees are receiving attendant care from a non-LRI or have pursued other waiver and State Plan services. It appears, therefore, that only a small minority of H&W Waiver enrollees with various combinations of uniquely challenging ailments and family circumstances are likely to need LRI-provided attendant care to avoid institutionalization. To satisfy the integration mandate, the State may design the H&W Waiver to preserve LRI-provided attendant care as a last resort for that small subset of cases without prohibiting it entirely. That would be a lawful and reasonable alternative to hoping that imaginary or hypothetical providers will provide needed care. The federal government encourages States to develop waiver policies that make LRIs providers of last resort, without prohibiting them. If LRI-provided attendant care is needed in only a small

minority of cases, the expense of reimbursing it is unlikely to compel drastic reductions in services for other disabled individuals—especially since the alternative, institutionalization, is more expensive.[8]

This lawsuit is still in its early stages. Perhaps FSSA can develop the record and show that authorizing LRI-provided attendant care would require it to shift resources in an inequitable manner. But at this time, it has offered only doomsday predictions about the impact of authorizing LRI-provided attendant care on Indiana's Medicaid program. Those predictions are difficult to reconcile with the State's apparent willingness to spend the same amount of money or more on other home-based services or to institutionalize Plaintiffs and other waiver enrollees. FSSA has therefore failed to show that LRI-provided attendant care is so financially burdensome that it would compel a fundamental alteration to the substance of the H&W Waiver.

---

[8] FSSA has also raised the concern that authorizing attendant care services for a smaller subset of waiver enrollees would result in some families being without any option for paid care from an LRI. This argument assumes that LRI-provided attendant care cannot be authorized without taking away the option of LRI-provided structured family caregiving. FSSA has not pointed to any legal authority, and we have found none, that would require it to eliminate LRI-provided structured family caregiving to authorize LRI-provided attendant care. Like the decision to disallow LRI-provided attendant care, eliminating LRI-provided structured family caregiving would be the State's policy choice—a choice that would also be subject to the integration mandate. If FSSA is permanently enjoined from enforcing the restriction on LRI-provided attendant care, it could obviously modify other parts of the H&W Waiver as necessary to comply with its legal obligations and fiscal constraints. At all times, though, FSSA is subject to and must comply with the integration mandate.

3. *Effect of Armstrong v. Exceptional Child Center*

Having failed to show that Plaintiffs are not at serious risk of institutionalization or that authorizing LRI-provided attendant care would fundamentally alter the H&W Waiver, FSSA offers one last argument. It depends on recharacterizing Plaintiffs' position. FSSA contends that Plaintiffs' ADA claims seek in substance to raise the State's reimbursement rates, a form of relief that FSSA says is barred by the Supreme Court's decision in *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320 (2015). In *Armstrong*, the Court considered whether health-care providers have a private cause of action to enforce 42 U.S.C. § 1396a(a)(30)(A) of the Medicaid Act, which sets out requirements that States must follow when setting Medicaid reimbursement rates. 575 U.S. at 322–24. The Court concluded that section 1396a(a)(30)(A) is not privately enforceable under the Supremacy Clause or through a suit in equity. *Id.* at 326–28. Although the *Armstrong* plaintiffs did not assert that section 1396a(a)(30)(A) itself contains an implied private right of action, a plurality of the Court and Justice Breyer agreed that it does not, albeit for different reasons. *Id.* at 331 (plurality opinion of Scalia, J.), 336 (opinion of Breyer, J.).

FSSA reads *Armstrong* to prohibit Medicaid beneficiaries from bringing any claim seeking a different Medicaid reimbursement rate under section 1396a(a)(30)(A) or through any other vehicle. It believes that Plaintiffs' ADA claims are disguised challenges to the State's Medicaid reimbursement rates and therefore barred by *Armstrong*. We disagree on both points. Neither *Armstrong*'s holding nor its reasoning supports FSSA's attempt to evade the *Olmstead* framework for evaluating Plaintiffs' ADA claims. And regardless, Plaintiffs'

ADA claims are not disguised attempts to engage the district court in ratemaking.

First, Plaintiffs are not proceeding pursuant to section 1396a(a)(30)(A), and *Armstrong* has no bearing on Plaintiffs' ADA claims. The question presented in *Armstrong* was narrow: whether section 1396a(a)(30)(A) is privately enforceable. In saying no, the Court never suggested that the unenforceability of section 1396a(a)(30)(A) somehow nullifies other causes of action explicitly created by Congress in different statutes, such as the ADA. Furthermore, *Armstrong* did not place a substantive limit on the relief that Medicaid beneficiaries may seek through litigation brought under statutory provisions other than section 1396a(a)(30)(A). See *M.G. ex rel. Garcia v. Armijo*, 117 F.4th 1230, 1252–53 (10th Cir. 2024) (*Armstrong* does not preclude every suit that might require States to spend funds or to raise health-care rates). None of the various opinions even broached the unpresented and legally distinct issue of the kind of relief that a plaintiff may seek under the ADA.[9]

---

[9] Our precedent does not hold otherwise. In *O.B.*, we speculated that "we could not order the agency to eliminate the [nurse] shortage by raising [its] rates." 838 F.3d at 842. But the *O.B.* plaintiff did not seek that relief, and our statement considering such a hypothetical request is not binding, as we later recognized in *Vaughn*. See 968 F.3d at 826 (clarifying that the "question whether a Medicaid recipient has a private right of action to challenge Medicaid rates as too low to elicit necessary services may come up" is still unresolved). Moreover, in *O.B.*, the plaintiffs relied exclusively on other provisions of section 1396a(a). See *O.B.*, 838 F.3d at 839. If they had sought an order requiring the State agency to raise its Medicaid rates, there would have been a genuine possibility that they were attempting to circumvent *Armstrong* since their claims relied exclusively on other

Even if *Armstrong* could be read to limit substantively the relief that disabled individuals may seek through litigation under the ADA, it would have no bearing on the outcome of this case. Plaintiffs "are not, directly or surreptitiously, seeking to engage the district court in ratemaking pursuant to § 1396a(a)(30)(A)" or any other statute. *Id.* at 1252. They do not ask FSSA to raise the rate it pays to any category of providers or for any category of services. They ask only that FSSA allow their uniquely qualified and available LRIs to provide attendant care services, as it had for years prior to the July 2024 policy change. In other words, Plaintiffs are challenging *who* is allowed to perform a certain service, not the rate at which FSSA reimburses providers. Their request for a different provider does not embroil the courts in the kind of direct rate-setting that Justice Breyer found problematic in *Armstrong*. See 575 U.S. at 334–35 (opinion of Breyer, J.).

Because the State continues to raise *Armstrong* in ADA cases, we acknowledge that rates have a significant impact on the availability of Medicaid services. Many Medicaid beneficiaries would likely be better off if States raised their Medicaid reimbursement rates. But a plaintiff's ADA suit does not automatically fail under *Armstrong* merely because she brings it to rectify an issue that could be addressed in numerous ways, one of which is raising rates. The State cannot avoid its legal obligations under the ADA and its integration mandate by pointing out that a plaintiff's dilemma could be solved by a rate increase that she did not request. Here, the preliminary injunction record shows that the difference between the rates for attendant care services and structured family caregiving is

provisions of section 1396a(a). Because the Plaintiffs here are seeking relief primarily under the ADA, this suit does not present that problem.

the difference between E.R. and G.S. remaining at home with their loved ones and being forced to reside in institutions. The State could comply with the integration mandate by paying structured family caregiving providers more, but that is not what Plaintiffs request, nor what the district court's injunction requires. *Armstrong* therefore does not block the injunctive relief granted in this case.

In sum, then, Plaintiffs have shown a substantial likelihood of prevailing on the merits of their claims under the ADA's integration mandate, supporting the injunctive relief ordered in this case.

B.  *Irreparable Harm and Balance of the Equities*

Because the district court did not err in finding that Plaintiffs are likely to succeed on the merits of their ADA claims, we turn to its finding that Plaintiffs are likely to suffer irreparable harm without preliminary injunctive relief and its equitable balancing of the harms. We agree with the district court that Plaintiffs will likely suffer irreparable harm—the denial of medically necessary attendant care services in their homes—without preliminary injunctive relief. See *Bontrager v. Indiana Family & Soc. Servs. Admin.*, 697 F.3d 604, 611 (7th Cir. 2012) (collecting cases).

FSSA argues, however, that the October 1 injunction places it at risk of grave and irreparable harm. It contends that the injunction impermissibly compels FSSA to violate federal law, thereby placing the entire H&W Waiver at risk of being terminated. FSSA further argues that the district court exceeded its equitable authority in entering the October 1 injunction. It asserts that Seventh Circuit precedent prohibits district courts from issuing injunctions requiring a State to

furnish a Medicaid beneficiary's care "entirely out of its own funds, unreimbursed and unsupplemented by Medicaid." *Vaughn*, 968 F.3d at 826. In the State's view, any payments made to Plaintiffs' mothers are ineligible for federal reimbursement, rendering the October 1 injunction impermissible.

We appreciate FSSA's concerns—the termination of the H&W Waiver would undoubtedly cause irreparable harm to both the State and to other waiver enrollees who would experience service disruption. The argument has the superficial appeal of a complete showstopper. But a closer look shows that the October 1 injunction does not compel FSSA to violate federal law or to furnish Plaintiffs' care entirely out of its own funds. FSSA's allegations of irreparable harm are too speculative to overcome Plaintiffs' concrete evidence that they will be denied medically necessary care without preliminary injunctive relief.

1. *Violation of Federal Law?*

FSSA asserts that federal regulations expressly prohibit FSSA from paying Ms. Carter and Ms. Knight for providing attendant care services. By ordering the State to pay them for providing attendant care services, the argument goes, the district court's order compels it to violate federal law. Needless to say, courts are not authorized "to issue injunctions that authorize or direct people to violate valid federal statutes" or regulations. *Schering Corp. v. Illinois Antibiotics Co.*, 62 F.3d 903, 907 (7th Cir. 1995). But after reviewing the applicable regulations, we think that FSSA misconstrues the legal constraints on its ability to pay Ms. Carter and Ms. Knight for providing attendant care.

FSSA's argument hinges on 42 U.S.C. § 1396d(a)(24) and 42 C.F.R. § 440.167, both of which define "personal care services," the category of services to which attendant care and structured family caregiving belong. As relevant here, both provisions define personal care services as services "[p]rovided by an individual who is qualified to provide such services and who is not a member of the individual's family." 42 C.F.R. § 440.167(b) specifies: "For purposes of this section, family member means a legally responsible relative," which is defined in turn to include the spouse of a recipient or the parent of a minor recipient. Personal Care Services in a Home or Other Location, 62 Fed. Reg. 47896, 47899 (Sep. 11, 1997). According to FSSA, sections 1396d(a)(24) and 440.167 expressly prohibit it from paying Plaintiffs' mothers for providing attendant care services.

Neither provision relied upon by FSSA expressly prohibits the State from doing anything. They both define "personal care services" and therefore inform States which services are eligible for approval and reimbursement through the Medicaid program. But they do not contain any prohibitory language directly regulating the conduct of States, which remain free to authorize and reimburse any service they like—just without federal financial participation. That understanding of section 440.167 comports with the federal government's technical Medicaid guidance, which explains that "42 CFR 440.167 prohibits [federal financial participation] for payments to legally responsible individuals for the provision of state plan personal care services." CMS Technical Guidance at 120. The technical guidance confirms that section 440.167 sets out CMS's policy for when it will approve and pay for personal care services. It does not prohibit States from paying LRIs for

providing personal care services. The October 1 injunction therefore does not compel FSSA to violate federal law.

2.  *Federal Financial Participation*

Our discussion of 42 U.S.C. § 1396d(a)(24) and 42 C.F.R. § 440.167 emphasizes what is really at stake here: the State's ability to receive federal financial participation for its provision of these Medicaid services. The State's concern about the prospect of losing federal financial participation is well taken. In *Vaughn*, we explained that district courts should not order injunctive relief that requires a State to furnish Medicaid services "entirely out of its own funds, unreimbursed and unsupplemented by Medicaid." 968 F.3d at 826. That limitation makes good sense.

Medicaid is a cooperative federal-state program in which States agree to provide certain medical care and services in exchange for receiving federal funding. See *Douglas v. Independent Living Center of Southern California, Inc.*, 565 U.S. 606, 610–611 (2012). Requiring the State to provide services that are ineligible for federal reimbursement denies it the benefit of the bargain that it has struck with the federal government. The ADA does not require States to go beyond the constraints imposed by federal Medicaid law to accomplish its purposes. Although our equitable authority to enforce federal anti-discrimination laws is broad, we do not think it stretches as far as compelling the State to provide Medicaid services that are ineligible for federal reimbursement and therefore outside the scope of Medicaid. See *Georgia ex rel. Dep't of Med. Assistance v. Heckler*, 768 F.2d 1293, 1298 (11th Cir. 1985) (holding that services for which federal funds are not available are outside scope of federal Medicaid program); see also *Harris v. McRae*, 448 U.S. 297, 310

(1980) (unavailability of federal funding for medically necessary abortions under Hyde Amendment relieved States of the obligation to cover those abortions in their Medicaid plans).

At present, however, there is no evidence that the State will be forced to bear the full cost of Plaintiffs' care. That distinguishes this case from *Vaughn*, where there was conclusive evidence that the district court's permanent injunction had compelled the State to provide Medicaid services without federal financial participation. In *Vaughn*, the State certified that it had complied with the injunction by contracting with a home-health agency at the market rate for skilled nursing care, which was higher than the Medicaid cap. 968 F.3d at 818. Because the contract exceeded the Medicaid cap, the State was not authorized to use any federal Medicaid funds to pay the home-health agency. As a result, it allocated only State funds to cover the cost of the plaintiff's services. *Id.*

In this case, there is no similar affirmative evidence that federal financial participation is unavailable for payments FSSA makes to Ms. Carter and Ms. Knight pursuant to the October 1 order. CMS's policy is that it will not pay LRIs "for supports that they are ordinarily obligated to provide." CMS Technical Guidance at 120. It will, however, pay LRIs for providing "extraordinary care," which is defined as "care exceeding the range of activities that a legally responsible individual would ordinarily perform in the household on behalf of a person without a disability or chronic illness of the same age." *Id.* Plaintiffs argue, and the district court agreed, that "there is no doubt … that what [Ms. Carter and Ms. Knight] do for their children is extraordinary in every sense of the word." We agree. The 24/7 supervision and assistance with

activities of daily living that E.R. and G.S. require go far beyond what the law expects of parents of children without disabilities. The October 1 injunction is therefore consistent with CMS's policy for when it will and will not pay LRIs for providing attendant care. We will not disturb the injunction in the absence of affirmative evidence that federal financial participation is not available.[10]

Setting aside the lack of affirmative evidence for FSSA's position, the agency's own conduct in this case and experience in prior ADA cases undermine the force of its stated fear of losing federal financial participation or of having its waiver program terminated. FSSA paid LRIs (including Ms. Knight

---

[10] FSSA also cites 42 C.F.R. § 441.360(d) as evidence that federal financial participation is not available for payments made to Ms. Carter and Ms. Knight for providing attendant care. This argument is also unpersuasive. Section 441.360(d) provides that federal funds are not available for expenditures for "[s]ervices that are not included in the approved State Plan and not approved as waiver services by CMS." But this section only applies to services listed in 42 C.F.R. § 440.181, which governs home- and community-based services for individuals *age 65 or older*. E.R. and G.S. are both children, so the limits in section 441.360(d) do not apply to them. 42 C.F.R. § 441.310 sets out the limits for federal financial participation applicable to the services that E.R. and G.S. receive. See 42 C.F.R. § 440.180(a)(3). Unlike section 441.360(d), section 441.310 does not prohibit federal financial participation for services not approved by CMS. The absence of that limit in section 441.310 is evidence that no such limit applies to the services received by Plaintiffs. See *Miller v. F.D.I.C.*, 738 F.3d 836, 842–43 (7th Cir. 2013) ("the inclusion of limiting language in one subsection but not another subsection usually yields the inference that the limitation does not apply to the latter subsection" (citing *Pacific Operators Offshore, LLP v. Valladolid*, 565 U.S. 207, 216 (2012))); *Bria Health Servs., LLC v. Eagleson*, 950 F.3d 378, 382 (7th Cir. 2020) ("The same basic rules that apply to statutory interpretation apply to regulatory interpretation.").

and Ms. Carter) to provide attendant care services for years even though such payments were not authorized by the terms of the A&D Waiver. There is no evidence that the federal government ever threatened to terminate the A&D Waiver over FSSA's supposed noncompliance.

FSSA has not presented any evidence that CMS intends in the future to withhold federal funds for payments made to Plaintiffs' mothers for providing attendant care pursuant to the district court's order. At oral argument, FSSA confirmed that there is currently no indication that CMS will take such action. Further, this is not the first or even the second time that FSSA has been ordered to act contrary to the terms of its federally approved Medicaid program. E.g., *Bontrager*, 697 F.3d 604 (affirming injunction preventing State from enforcing cap on dental services); Order of Judgment, *B.N. ex rel. A.N. v. Murphy*, No. 3:09-CV-199 (N.D. Ind. Nov. 30, 2011) (enjoining enforcement of A&D Waiver provision). FSSA has not provided any evidence that it lost federal funding in any of the past cases in which it was enjoined.

Accordingly, the availability of federal funding for particular expenditures is, at least in this case, a factual question.[11] Further factual development might call for a different outcome. If FSSA produced persuasive evidence that federal funding for Indiana's Medicaid plan is actually at risk, the district court would have to consider that evidence, rebalance the

---

[11] In other cases, it may be clear from the language of the Medicaid Act or its implementing regulations that federal funding is unavailable. See, e.g., 42 C.F.R. § 441.360(d). Because the federal regulations applicable to the H&W Waiver are ambiguous about the availability of federal financial participation, we treat the availability of federal funding for payments to Ms. Carter and Ms. Knight as a factual question.

equities, and potentially modify the October 1 injunction. Still, we have yet to find a single example of a State agency that has been denied federal funds or had its waiver program terminated for complying with a court order providing relief under the ADA. Courts have been adjudicating ADA cases for decades and on occasion have enjoined States from enforcing parts of their Medicaid programs that violate the ADA's integration mandate. They have also ordered preliminary and interim relief to prevent irreparable harm until States can formally amend their Medicaid programs through the federal approval process. See, e.g., *Chisholm ex rel. CC v. Kliebert*, No. 97-3274, 2013 WL 4089981, at *11–12 (E.D. La. Aug. 13, 2013) (declining to stay a preliminary injunction requiring State to provide services pursuant to court order that were not yet approved by CMS). We see no reason to depart from that practice. On this record, the risk that the H&W Waiver will be terminated or that the State will have to fund E.R.'s and G.S.'s care entirely out of its own funds appears to be more speculative than real.[12]

###        3.   *Balancing the Equities*

Having rejected FSSA's argument that the preliminary injunction improperly compels it to violate federal law or to

---

[12] Because there is no evidence that payments made pursuant to the preliminary injunction are ineligible for federal financial participation, we need not opine on whether 42 C.F.R. § 431.250(b) explicitly makes federal funds available under these circumstances. If it does, that would reinforce our conclusion that the district court properly ordered FSSA to continue paying Ms. Carter and Ms. Knight for providing attendant care. If, however, section 431.250 does not authorize federal financial participation in these circumstances, it would not render the district court's injunction an abuse of discretion for the reasons set forth above.

fund Plaintiffs' care exclusively out of State funds, we further conclude that the district court did not abuse its discretion by finding that the balance of equities and public interest weighed in favor of granting injunctive relief. In making this determination, the court had to consider whether "the harm to the defendant would substantially outweigh the benefit to the plaintiff." *Bontrager*, 697 F.3d at 611, quoting *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 789 (7th Cir. 2011). Because the court's "equitable judgment is entitled to substantial deference on appeal," FSSA has a "steep hill to climb." *Finch v. Treto*, 82 F.4th 572, 578 (7th Cir. 2023). Its task is especially difficult because we have already affirmed a preliminary injunction under very similar circumstances.

In *Bontrager*, we affirmed the district court's preliminary injunction preventing the State from enforcing its $1,000 cap on medically necessary dental services covered by its Medicaid plan. 697 F.3d at 612. As in this case, the State had adopted the $ 1,000 cap as a cost-cutting measure. *Id.* at 606. Regarding the balance of the equities, we explained that the State's "potential budgetary concerns" did not outweigh the potential harm the plaintiff would suffer from the denial of medically necessary dental services. *Id.* at 611. Because the "Medicaid statute was designed to pay for the healthcare costs of 'the most needy in the country,'" the public interest was best served by preserving "Medicaid recipients' interests in access to medically necessary health care." *Id.* at 611–12, quoting *Schweiker v. Hogan*, 457 U.S. 569, 590 (1982).

This case presents essentially the same constellation of interests that we considered in *Bontrager*. The attendant care that Plaintiffs seek from their mothers is necessary to prevent them from being uprooted from their homes, families, and

support systems. In the absence of preliminary injunctive re-
lief, Plaintiffs are highly likely to be institutionalized. Before
the court entered the October 1 injunction, both Ms. Carter
and Ms. Knight had already taken concrete steps toward plac-
ing their children in institutions. By contrast, for the reasons
explained above, FSSA is unlikely to experience any irrepara-
ble harm as a result of complying with the injunction. The dis-
trict court therefore did not err in concluding that Plaintiffs'
interest in receiving medically necessary health care on terms
equal to non-disabled persons outweighs the State's concerns
about its budget variance or the highly speculative possibility
of the loss of federal funding. The court also did not err in
determining that the public interest is best served by enforc-
ing federal anti-discrimination law.

C. *Scope of Relief*

Finally, Plaintiffs contend that the district court's October
1 injunction is insufficient to fully prevent Plaintiffs from ex-
periencing irreparable harm in two ways. First, they argue
that Plaintiffs' mothers must be allowed to serve as paid pro-
viders of attendant care until home nurses are both secured
*and* properly trained—a process that could take weeks or
months to complete. Second, Plaintiffs argue that the amount
of home nursing ordered by the district court is inadequate,
given Plaintiffs' medical conditions and the care they have
needed in the past.

The appropriate scope of an injunction is committed to the
district court's sound discretion. *Republic Technologies (NA),
LLP v. BBK Tobacco & Foods, LLP*, 135 F.4th 572, 587 (7th Cir.
2025); *Eli Lilly Co. v. Arla Foods, Inc.*, 893 F.3d 375, 384 (7th Cir.
2018). On this record, it is uncertain whether Plaintiffs' re-
quested   modifications   are   necessary   or   appropriate.

Regarding the amount of home nursing Plaintiffs need, the court's most recent order did not order a specific amount of home nursing, and it is not clear whether the court intended to retain that element of its previously ordered relief. Furthermore, after *Medina*, it may no longer be appropriate for the district court to order a specific amount of home nursing services.

It is also not clear that it would be appropriate for Plaintiffs' mothers to serve as paid providers of attendant care until their hypothetical and not-yet-newly-hired home nurses are eventually trained to care for these Plaintiffs. As Plaintiffs themselves explained, they are seeking to be paid for attendant care as that service is defined in the H&W Waiver. Training home nurses does not appear to be one of the services encompassed by that definition. It may be, however, that a combination of home nursing and attendant care services is necessary to prevent either child's institutionalization and therefore that the injunction should be modified to take that possibility into account. For example, G.S.'s medical providers have advised that he needs multiple caretakers at a time to meet his mobility needs. Ms. Knight might therefore need to continue providing attendant care, even if she secured a nurse to meet G.S.'s skilled nursing needs. Because the district court is closer to the facts and to changing circumstances, it is best positioned to consider Plaintiffs' arguments and to tailor the preliminary injunction to prevent Plaintiffs' avoidable institutionalization.

The district court's October 1 injunction is AFFIRMED, and we remand this case for further proceedings consistent with this opinion.